**J.P.T. AUTOMOTIVE, INC., Plaintiff,**

v.

**TOYOTA MOTOR SALES, U.S.A., INC., Defendant.**

**No. 09–CV–0204 (JS)(ETB).**

United States District Court, E.D. New York.

Sept. 14, 2009.

Heath S. Berger, Esq., Steinberg, Fineo, Berger & Fischoff, P.C., Woodbury, NY, for Plaintiff.

Carl J. Chiappa, Esq., Katie Mae Lachter, Esq., Hogan & Hartson, LLP, New York, NY, for Defendants.

### ORDER ADOPTING REPORT AND RECOMMENDATION

SEYBERT, District Judge.

The Court is in receipt of Magistrate Judge E. Thomas Boyle's Report and Recommendation ("R & R" or "Report"), which recommended that Plaintiff's Motion for a Preliminary Injunction be denied. Plaintiff has objected to this Report and Recommendation. For the foregoing reasons, the Court finds Plaintiff's objections to be without merit and ADOPTS Magis-

trate Judge Boyle's R & R in its entirety. As a result, the Court *sua sponte* lifts the Temporary Restraining Order it imposed on January 21, 2009.[1]

## BACKGROUND

The Report sets forth the facts of this case in a thorough manner, and therefore, the Court will not recite them in detail. *See* 09–CV–0204, Docket No. 53 (E.D.N.Y. Jun. 3, 2009). In summary: Plaintiff is an automobile dealer, and Defendant's former franchisee. In the course of its business, Plaintiff experienced severe financial problems, which led it to fall behind on numerous accounts, lose financing from lenders, and submit fraudulent odometer statements to a credit company. In response to Plaintiff's numerous breaches of its franchise agreement, Defendant notified Plaintiff that it intended to terminate it. The parties subsequently agreed to extend the franchise agreement's termination date until January 19, 2009.

On January 20, 2009, one day after its franchise agreement terminated, Plaintiff commenced this action. On January 21, 2009, the Court issued a Temporary Restraining Order which, as a practical matter, revived the terminated franchise agreement, enabling Plaintiff to continue operating its business over the past several months. On June 3, 2009, Magistrate Judge Boyle issued an R & R which recommended that Plaintiff's motion for a preliminary injunction be denied.

On June 20, 2009, Plaintiff filed objections to Magistrate Judge Boyle's Report. Specifically, Plaintiff argues that Magistrate Judge Boyle erred in finding that: (1) Plaintiff's liabilities exceed its assets; (2) Plaintiff's franchise agreement terminated on January 19, 2009, which was Mar-

tin Luther King Day, rather than January 20, 2009; (3) Plaintiff was not entitled to an "automatic" injunction under the New York Franchised Motor Vehicle Dealer Act ("FMVDA"); (4) Plaintiff was not entitled to a preliminary injunction under federal law. Each of Plaintiff's objections is without merit.

## DISCUSSION

### I. *Standard of Review*

■ "When evaluating the report and recommendation of a magistrate judge, the district court may adopt those portions of the report to which no objections have been made and which are not facially erroneous." *Walker v. Vaughan,* 216 F.Supp.2d 290, 291 (S.D.N.Y.2002) (citation omitted). A party may serve and file specific, written objections to a magistrate's report and recommendation within ten days of receiving the recommended disposition. *See* FED. R. CIV. P. 72(b). Upon receiving any timely objections to the magistrate's recommendation, the district "court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed.R.Civ.P. 72(b). A party that objects to a report and recommendation must point out the specific portions of the report and recommendation to which they object. *See Barratt v. Joie,* No. 96–CV–324, 2002 WL 335014, at *1, 2002 U.S. Dist. LEXIS 3453, at *2 (S.D.N.Y. March 4, 2002) (citations omitted).

■ When a party raises an objection to a magistrate judge's report, the Court must conduct a *de novo* review of any contested sections of the report. *See Pi-*

---

1. The Court's January 21, 2009 Order set forth that Plaintiff was entitled to a temporary restraining order only "pending a hearing for a preliminary injunction," which has now taken place. 09–CV–0204, Docket # 11 at § 1.

*zarro v. Bartlett,* 776 F.Supp. 815, 817 (S.D.N.Y.1991). But if a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Pall Corp. v. Entegris, Inc.,* 249 F.R.D. 48, 51 (E.D.N.Y.2008). Furthermore, even in a *de novo* review of a party's specific objections, the court ordinarily will not consider "arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the magistrate judge in the first instance." *Kennedy v. Adamo,* 02–CV–1776, 2006 WL 3704784, at *1 (E.D.N.Y.2006).

Here, Plaintiff's objections consist of nothing more than reiterating its original arguments before Magistrate Judge Boyle, coupled with a few general or conclusory allegations. Therefore, the Court reviews the Report for clear error. The Court notes, however, that a *de novo* review would also have led to it adopting the Report in its entirety.

## II. *Plaintiff's Objections*

### A. *Magistrate Judge Boyle did not err in Finding that Plaintiff's Liabilities Exceeded its Assets*

Plaintiff first argues that Magistrate Judge Boyle made a factual error in finding that Plaintiff's liabilities exceeded its assets. Specifically, Plaintiff argues that Magistrate Judge Boyle erred by "failing to take into account the testimony of the plaintiff [sic] expert witness," who testified that Plaintiff's business had $2–3 million in goodwill value, and instead crediting the Defendant's expert witness, who found that Plaintiff's business had no goodwill

value. Pl. Obj. Br. at 2–3. At a minimum, Plaintiff argues, questions concerning Plaintiff's valuation "are matters best left for a trial on the merits of the within matter, or for the Bankruptcy Court." Pl. Obj. Br. at 1.

■ Plaintiff is mistaken. As an initial matter, it is Plaintiff who sought preliminary injunctive relief in this Court—not in the Bankruptcy Court. Thus, it was Plaintiff who asked this Court to take a preliminary peek at the "merits of the within matter," rather than waiting for a trial. Accordingly, Magistrate Judge Boyle had not only the right, but the obligation, to assess the credibility of the parties' dueling experts, to determine whether Plaintiff had established: (1) "a likelihood of success on the merits"; or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 242 (2d Cir. 2009).[2] Fulfilling that obligation, Magistrate Judge Boyle made no clear error (indeed, no error at all) in crediting the testimony of defense expert Frank Fumai, a Deloitte & Touche accountant, who concluded that Plaintiff had no goodwill, and rejecting the testimony of Alan Richards, who served both as Plaintiff's attorney and expert witness. R & R at 366 n. 13. Indeed, as Magistrate Judge Boyle noted, Plaintiff's own voluntary bankruptcy petition lists assets of $8,236,410.80 and liabilities of $10,659,530.69, demonstrating Plaintiff's insolvency. *Id.*

Plaintiff also argues that Magistrate Judge Boyle erred in failing to consider Plaintiff's "most valuable asset," "that of

---

**2.** In continuing to permit plaintiffs to obtain a preliminary injunction upon raising "sufficiently serious questions going to the merits," *Zino Davidoff SA* appears to conflict with the Supreme Court's most recent statement of the law. *See Winter v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008) (a movant "must establish that he is likely to succeed on the merits").

its franchise agreement." Pl. Obj. Br. at 3. But, as Magistrate Judge Boyle found (discussed below), Plaintiff's franchise agreement has already been terminated. Thus, Magistrate Judge Boyle made no error in not considering its purported "value."

### B. *Magistrate Judge Boyle did not err in Finding that Plaintiff's Franchise Agreement Terminated on Martin Luther King Day*

Plaintiff also argues that Magistrate Judge Boyle erred in finding that Plaintiff's franchise agreement terminated on January 19, 2009, which was Martin Luther King Day. Plaintiff argues that, because January 19, 2009 was a legal holiday, Fed.R.Civ.P. 6 and N.Y. Gen. Const. L. § 25 "extended the termination date to January 20, 2009," the next day after the legal holiday. But once again, Plaintiff is mistaken and Magistrate Judge Boyle is correct.

■ As stated in its plain text, Fed. R.Civ.P. 6 "appl[ies] in computing any time period specified in these rules or in any local rule, court order, or statute." Here, Plaintiff does not dispute a time period specified in any court rule, court order or statute. Rather, Plaintiff seeks to abrogate the express terms of a contract entered into under New York law—under which Plaintiff's franchise agreement terminated on January 19, 2009. Nothing in Fed.R.Civ.P. 6 authorizes such an abrogation.

Plaintiff is also mistaken that, under Fed.R.Civ.P. 6, January 20, 2009 was "the first day the Plaintiff was able to file suit." Plaintiff received notice that Defendant intended to terminate the franchise agreement on October 15, 2008. Nothing precluded Plaintiff from filing suit then to enjoin this planned termination, or in the subsequent three months. The fact that Plaintiff waited until the day after the franchise agreement actually terminated is not this Court's concern, or the fault of Fed.R.Civ.P. 6.

■ Plaintiff's reliance on N.Y. Gen. Const. L. § 25 is equally without merit. By its plain text, N.Y. Gen. Const. L. § 25 concerns only contracts for "the payment of money or the performance of a condition." As Magistrate Judge Boyle correctly found, there was no payment of money or "condition" to be performed here. R & R at 362 n. 10. Rather, there was a franchise agreement that—by the parties' agreement—terminated on a specific day. Nothing in N.Y. Gen. Const. L. § 25, or elsewhere in New York law, precludes parties from contracting to end a contract on a legal holiday. *See* R & R at 362 n. 10 (collecting cases).

### C. *Plaintiff was not Entitled to an "Automatic" Injunction Under the FMVDA*

■ Plaintiff also objects to Magistrate Judge Boyle's finding that it was not entitled to an "automatic" injunction under the FMVDA. Again, Plaintiff is wrong. As Magistrate Judge Boyle correctly found, the FMVDA's plain text entitles dealers to an automatic stay only of a franchise agreement's "threatened" or "proposed" termination. R & R at 361 (citing N.Y. Veh. & Traf. L. § 463(2)(e)(1)). Here, Plaintiff's franchise agreement terminated on January 19, 2009 and Plaintiff did not file suit until January 20, 2009. Thus, at the time of Plaintiff's suit, Plaintiff no longer faced a "threatened" or "proposed" termination. Rather, its franchise agreement had already terminated. Accordingly, the FMVDA's automatic stay provision affords Plaintiff no relief. *See* R & R at 361. And, consequently, Plaintiff's argument concerning whether the FMVDA applies prospectively or retroactively, or

whether exceptions preclude its application, (*See* Pl. Obj. Br. at 8–12) is irrelevant.

### D. *Plaintiff is not Entitled to a Preliminary Injunction Under Federal Law*

█ Plaintiff also argues that, contrary to Magistrate Judge Boyle' s findings, it met its burden for obtaining a preliminary injunction under federal law, because it showed irreparable harm, a likelihood of success on the merits (or sufficiently serious questions going to the merits), and a balance of the hardships, and because granting it a preliminary injunction favors the public interest. Pl. Obj. Br. at 12–19. Again, Magistrate Judge Boyle did not err in rejecting these arguments.

Magistrate Judge Boyle correctly found that Plaintiff would not suffer irreparable harm because Plaintiff's business is already worthless, as its liabilities "significantly outweigh its assets." R & R at 364. Thus, because Plaintiff "is no longer a viable business entity," it will not suffer irreparable harm from the denial of a preliminary injunction. R & R at 364–65 (collecting cases).

Magistrate Judge Boyle also correctly found that Plaintiff had failed to either make a showing of likelihood of success on the merits, or set forth sufficiently serious questions going to merits. As Magistrate Judge Boyle noted, and Plaintiff concedes, the crux of Plaintiff's action is that Defendant lacked cause to terminate the franchise agreement based on Plaintiff's purported insolvency. R & R at 365; Pl. Obj. Br. at 15. But, as Magistrate Judge Boyle correctly found, Plaintiff was clearly insolvent in October 2008, and remains insolvent today—as demonstrated by Plaintiff's own voluntary bankruptcy filing. R & R at 366. Moreover, as Magistrate Judge Boyle properly concluded, Defendant had ample other grounds to terminate the franchise agreement, such as Plaintiff's failure to pay Defendant for parts it ordered, and Plaintiff's loss of financing. R & R at 366.

Having found no showing of irreparable harm, and no likelihood of success or sufficiently serious questions going to the merits, Magistrate Judge Boyle did not reach the balance of the hardships and public interest factors. Thus, the Court does not reach them. But, assuming *arguendo* that these factors were relevant, the Court notes that Plaintiff has failed to show that either tips in its favor. If a preliminary injunction was granted, Defendant would face severe hardships, as it would be forced to continue a franchise agreement with an insolvent entity. In addition, as Magistrate Judge Boyle found, Plaintiff engaged in incredibly dishonest (and arguably fraudulent or criminal) acts towards its customers, including: (1) accepting customer orders for vehicles it could not deliver; and (2) accepting "trade in" vehicles from customers with the understanding that it would pay off outstanding loans on the vehicles traded in, but then failing to pay off those loans—leaving customers with outstanding loans on cars they no longer owned. R & R at 360. As Defendant's franchisee, Plaintiff's conduct towards its customers ran the very real risk of harming Defendant's image and reducing Defendant's goodwill. The risk that this kind of conduct would continue (or similarly dishonest conduct would commence), with resulting harm to both customers and Defendant, significantly tips against Plaintiff under both the balance of the hardships and the public interest factors. Finally, the Court fails to see what public interest is served by: (1) abrogating a dully-entered into contract; for the purpose of (2) enabling an insolvent entity to remain in business, where it may continue

to rack up debts that it likely will never be able to repay.

## CONCLUSION

The Court ADOPTS Magistrate Judge Boyle's Report and Recommendation in its entirety. Having concluded that Plaintiff is not entitled to a preliminary injunction, the Court hereby *sua sponte* lifts the temporary restraining order it issued on January 21, 2009.

SO ORDERED

## REPORT AND RECOMMENDATION

E. THOMAS BOYLE, United States Magistrate Judge.

TO THE HONORABLE JOANNA SEYBERT, UNITED STATES DISTRICT JUDGE:

Before the court is the motion of the plaintiff, J.P.T. Automotive, Inc., d/b/a Victory of Five Towns ("plaintiff" or "Victory") for a preliminary injunction, enjoining defendant, Toyota Motor Sales, U.S.A ("defendant" or "Toyota"), from terminating the parties' automobile dealership franchise agreement. For the following reasons, I recommend that plaintiff's motion be denied.

### FINDINGS OF FACT

I. *The Parties and the Dealership Agreement*

Victory is a New York automobile dealer with its principal place of business in Inwood, New York. (Compl. ¶ 1.) Richard Cirillo ("Cirillo") is the President and sole owner of Victory. (*Id.* ¶ 11; Tr. 28; Def. Ex. A § IV.)

Toyota is a California corporation with its principal place of business in Torrance,

California. (Compl. ¶ 3.) Toyota is the authorized distributor of new Toyota vehicles, parts and accessories in the Continental United States. (Def. Findings of Fact ¶ 1; Compl. ¶ 4.)

Pursuant to a "Toyota Dealer Agreement," effective March 14, 2006 (the "Dealer Agreement"), Toyota appointed Victory as an authorized sales and service dealer for a period of twenty-four (24) months, with an expiration date of March 13, 2008. (Def. Ex. A.) The Dealer Agreement is the only franchise agreement between the parties. (Tr. 83.)

Under the Dealer Agreement, Victory is obligated to: (1) "establish and maintain actual net working capital in an amount not less than the minimum net working capital specified in a separate Minimum Net Working Capital Agreement executed by [Victory] and [Toyota] concurrently with [the Dealer Agreement]," [1] (Def. Ex. A § XX(A)); (2) "obtain and maintain at all times a confirmed and adequate flooring line with a bank or financial institution or other method of financing acceptable to [Toyota] to enable [Victory] to perform its obligations pursuant to [the Dealer Agreement]," (*Id.* § XX(B); Tr. 126); and, (3) "[m]ake all payments to [Toyota] when due." (Def. Ex. A § II(D); Tr. 95–96.) Failure to abide by these terms is grounds for Toyota to terminate the franchise agreement. (Def. Ex. A § XXIII(B)(1)-(2); Tr. 95–96.)

Specifically, the Dealer Agreement provides for "immediate termination" when certain conditions exist, including if Victory becomes insolvent. (Def. Ex. A § XXIII(B)(1)(b).) The Dealer Agreement also provides for termination of the franchise agreement, upon sixty (60) days notice, for,

---

**1.** The Minimum Net Working Capital Agreement was not submitted to the Court, undoubtedly because Victory does not dispute that its net working capital fell below the required minimum amount during all relevant times herein.

*inter alia:* (1) Victory's "[f]ailure ... to make any payments to [Toyota] when due," (*Id.* § XXIII(B)(2)(c)); (2) Victory's "[f]ailure to establish or maintain ... the required net working capital or adequate flooring line," (*Id.* § XXIII(B)(2)(d); Tr. 126); and, (3) "[i]mpairment of [Victory's] reputation or financial standing." (*Id.* § XXIII(B)(2)(f).)

## II. *Victory's Financial Problems*

In early 2008, Victory began to experience financial problems and ran out of working capital, such that the dealership did not have enough money to continue its daily operations. (Tr. 80.) By July 2008, Victory was unable to pay its debts as they became due. (Tr. 70.)

### A. *Victory's Floor Plan Financing*

In April 2008, Victory became late on its payments to its floor plan lender, M & T Bank, ("M & T"), with respect to new automobiles it purchased from Toyota.[2] (Tr. 79–80.) This condition is referred to as "sold out of trust," wherein the automobile dealership is paid by the retail customer for the automobile he or she is purchasing but fails to pay or is significantly late in paying the floor plan lender for that vehicle. (Tr. 34–35, 79–80.) As a result, M & T suspended Victory's floor plan line in November 2008. (Tr. 35, 80–81, 213; Def. Ex. G.) Victory has not had an operating dealership floor plan since that time and as a result, has not been able to purchase any new vehicles from Toyota.[3] (Tr. 81, 84.) Victory continued to pay M & T the interest owed on its floor plan financing debt after November 2008 but was forced to cease making those payments as well in January 2009 due to a lack of capital. (Tr. 85.) On January 20, 2009, M & T canceled Victory's floor plan line of credit and demanded the return of its inventory. (Tr. 85, 127; Def. Ex. M.) As of January 2009, Victory owed M & T approximately $1.8 million for both its new and used automobiles. (Tr. 34–35, 85–86.)

Thereafter, M & T commenced a lawsuit against Victory for the unpaid debt it is owed. (Tr. 88.) On February 24, 2009, M & T was granted a temporary restraining order that prevented Victory from delivering any new or used vehicles to customers. (Tr. 88–90; Def. Ex. B.) As of the date of the evidentiary hearing herein, it was unclear whether this temporary restraining order is still in effect. Nonetheless, Victory is still unable to purchase any new vehicles from Toyota and has not obtained a new floor plan from any other financial source. (Tr. 92–93.)

### B. *Victory's Parts Account*

Each dealership maintains an "open parts account" with Toyota, such that

---

**2.** A "floor plan" or a "wholesale financing agreement" is an agreement by which a financial institution—here, M & T Bank—agrees to pay the automobile manufacturer the invoiced price of each and every new automobile that the dealership buys from the manufacturer. (Tr. 76–77.) More specifically, the financial institution extends a line of credit to the automobile dealership, which the dealership uses to purchase vehicles from the manufacturer. (Tr. 77.) The financial institution then pays the manufacturer for the vehicles and they are delivered to the dealership. (Tr. 77.) Although the automobiles are the property of the dealership, the financial institution maintains a security interest in them. (Tr. 77.) When the dealership then sells an automobile, it is required to promptly pay the financing institution, or "floor plan lender," the amount of credit that was extended to purchase the vehicle, as well as interest. (Tr. 77–79.) In the within action, M & T is the floor plan lender for Victory's new automobile as well as its used ones. (Tr. 77–78.)

**3.** Victory also lacked the funds to purchase any new automobiles from Toyota independent of the floor plan financing. (Tr. 84.)

when the dealership purchases parts from Toyota, the amount of the purchase is debited from the dealership's account. (Tr. 50–51, 93.) The dealership is also credited for certain "incentive credits" or "warranty payments," which operates as an offset against the parts account. (Tr. 94.) If the dealership has a deficit in its parts account at the end of the month, it is required to pay Toyota the amount of the deficit by the fifteenth day of the following month, which Toyota withdraws electronically from the dealership's account. (Tr. 94.)

In October 2008, Victory advised Toyota that it was unable to pay the amount it owed on its parts account, which was approximately $200,000. (Tr. 51–52, 137, 94–95.) Victory was unable to make this payment because it did not have enough capital to pay all of its outstanding debts. (Tr. 95.) On October 15, 2008, Toyota attempted to withdraw the amount it was owed from Victory's dealership account, but the withdrawal was dishonored due to a lack of funding in the account. (Tr. 95, 205–07.) Although Victory has since reduced its outstanding parts debt to approximately $100,000, it is no longer able to order parts from Toyota on credit. (Tr. 52–53, 220.) Rather, Victory orders the parts that it needs on a daily basis and wire transfers the money owed to Toyota in what is essentially a "cash on delivery" or "COD" type arrangement. (Tr. 53.)

Part of Victory's parts agreement with Toyota includes leases on approximately twelve (12) automobiles under Toyota's TRAC program, which is basically a rental car operation. (Tr. 102.) Victory failed to pay the leases that it owed to Toyota under this program in the amount of approximately $6,000. (Tr. 102.) Victory thereafter entered into an agreement with Toyota to return the twelve TRAC vehi-

cles. (Tr. 102–03.) However, two of the TRAC vehicles were unable to be returned to Toyota because they were at a repair shop at the time—Burnside Avenue Garage ("Burnside")—due to damages that the vehicles sustained while in Victory's possession. (Tr. 103.) Victory was unable to pay Burnside for the repairs it made on the vehicles and as a result, Burnside filed a notice of lien and auction against the two vehicles. (Tr. 103–04; Def Ex. F.) Although Toyota offered to pay Victory's debt to Burnside in order to retrieve its automobiles, the vehicles had already been sold at auction and titled to Burnside. (Tr. 104–05, 220.) The loss to Toyota for the TRAC vehicles amounts to approximately $50,000, for which Victory is liable. (Tr. 220–21.) Victory has not made any payments on its outstanding parts debt since November 2008. (Tr. 221.)

## C. *New York State Sales Tax Owed by Victory*

In August 2008, Victory chose to make only a partial payment on the amount of sales tax it owed to New York State. (Tr. 96.) Victory opted to do so because it did not have enough money to pay all of the sales tax owed. (Tr. 96.) Victory has not made any other payments on its outstanding sales tax debt to New York State since August 2008. (Tr. 96–97.) As a result, Victory currently owes New York State approximately $1.2 million in unpaid sales tax. (Tr. 34, 97–98.)

## D. *The Forbearance Agreement with Toyota Motor Credit*

At some point, Victory submitted a series of fraudulent odometer statements to Toyota Motor Credit Corporation ("Toyota Motor Credit") in connection with obtaining financing for customers seeking to pur-

chase vehicles.[4] (Tr. 36, 105, 107–08.) Cirillo was not personally involved in the odometer fraud; rather, it was committed by certain of his employees without his knowledge. (Tr. 107.) As a result of the odometer fraud, Victory and Cirillo personally entered into a forbearance agreement with Toyota Motor Credit, under which they jointly owed Toyota Motor Credit approximately $2.5 million.[5] (Tr. 36–37, 105; Def. Ex. H.) Pursuant to the forbearance agreement, a payment was to be made on December 31, 2008 for the "shortfall" amount—as described in the forbearance agreement—existing at that time. (Tr. 105; Def. Ex. H.) The dealership was unable to make the December 31, 2008 payment. (36–37, Tr. 105.) On January 2, 2009, Toyota Motor Credit issued a notice of default and termination to Victory due to the failure to pay the shortfall amount then due under the forbearance agreement, which was approximately $100,000. (Tr. 36, 106–07; Def. Ex. I.) The January 2, 2009 notice also terminated Victory's Sales Financing Agreement as well as its Lease Financing Agreement with Toyota Motor Credit. (Def. Ex. I.)

### E. *Other Outstanding Debts*

Victory also owes approximately $2 million to the former owner of the dealership, Joseph Sala. (Tr. 98–99.) Victory has not made any payments on this debt for a number of months.[6] (Tr. 99.)

---

**4.** The purpose of the fraudulent odometer statements was to artificially inflate the value of the automobile so that the customer would be able to obtain a higher line of credit from Toyota Motor Credit than would normally be extended to the customer. (Tr. 108.)

**5.** The amount owed was determined by calculating the difference between the inflated values of the vehicles as a result of the fraudulent odometer statements and the vehicles' actual values. (Tr. 108.)

In addition, the mortgage on the property on which the dealership operates has been declared in default for non-payment by the mortgagor, M & T. (Tr. 141–42; Def. Ex. P.)

Victory has also failed to pay the required union benefits for its employees. (Tr. 101.) As a result, the Teamsters union commenced an action against Victory for $98,000 in unpaid benefits. (Tr. 101.) Victory defaulted in that action. (Tr. 102.)

Finally, Victory is indebted to its vendors for "a few hundred thousand dollars." (Tr. 36.)

### III. *Harm to Customers*

Although under a court order prohibiting it from delivering any vehicles to customers, Victory continued to take orders for new automobiles between February 24, 2009 and the time of the hearing before the undersigned. (Tr. 90.) Victory never disclosed to these customers that it was unable to deliver the vehicles they were purchasing. (Tr. 90–91.) Cirillo testified that Victory did not disclose the existence of the temporary restraining order to its customers because it was negotiating with M & T to get the restraining order overturned. (Tr. 91.)

In addition, when selling automobiles to customers, Victory took certain trades in from the consumers, with the understanding that it would pay off the outstanding loan on the automobile being traded in.

---

**6.** Cirillo testified that he has an agreement with Joseph Sala whereby Mr. Sala has agreed to forgo any payments on the outstanding debt until Cirillo is able to secure additional financing. (Tr. 99–100.) Nonetheless, this debt is a current liability of the dealership, for which it is in arrears. (Tr. 99.)

(Tr. 109, 215.) However, Victory failed to make payments on some of those loans. (Tr. 109, 215.) As a result, the consumer who traded in their vehicle was left obligated to pay the financing company for the automobile that he or she traded in, although they no longer possessed the vehicle. (Tr. 109–10, 215.)

Similarly, Victory traded vehicles with other dealerships, but failed to pay those dealerships for the vehicles it received. (Tr. 110.) Although Victory eventually paid those debts, for a period of time, the customers who purchased those automobiles for which Victory had failed to tender payment were unable to register the vehicles because they could not obtain clear titles to them. (Tr. 110.)

IV. *Termination of the Dealership Agreement*

On October 15, 2008, Kevin Cour ("Cour") of Toyota hand-delivered a notice of termination to Victory, which advised Victory of Toyota's intention to terminate the Dealer Agreement, based on Cirillo's representation to Toyota two days earlier that the dealership was insolvent.[7] (Tr. 112–13, 206–07; Def. Ex. J.) The October 15, 2008 notice of termination also advised Victory that if its floor plan line of credit were to be suspended, it would constitute an independent basis for termination under the Dealar Agreement. (Def. Ex. J.) The notice of termination further advised that the termination would be effective October 31, 2008.

On October 20, 2008, Toyota issued a second notice of termination to Victory, setting forth additional grounds for termination of the dealership, including Victory's inability to pay monies due and owing to Toyota. (Tr. 207; Def. Ex. K.) The notice informed Victory that the previous termination date of October 31, 2008 was extended to November 3, 2008. (Def. Ex. K.) The second notice of termination again advised Victory of Toyota's ability to terminate the Dealer Agreement if Victory were to lose its floor plan financing. (Def. Ex. K.) The termination date was subsequently extended several times to provide Victory with an opportunity to either recapitalize or sell the dealership. (Tr. 209.)

In late November or early December of 2008, Toyota engaged the accounting firm of Deloitte & Touche to analyze Victory's financial conditions. (Tr. 227–28.) Deloitte & Touche conducted its analysis for approximately two to three weeks and found that Victory had overstated the assets on its October 31, 2008 financial statement—which comprises the period from January to October 2008—by approximately $3.2 million. (Tr. 228, 240; Def. Ex. V.) When this overstatement was taken into account, Victory's assets amounted to approximately $10 million. (Tr. 240.) Deloitte & Touche further found that Victory's liabilities at that time amounted to approximately $11 million. (Tr. 240–41.) Accordingly, Deloitte & Touche concluded that, as of October 31, 2008, Victory's liabilities exceeded its assets by approximately $1 million.[8] (Tr. 242.)

7. Cour testified that Victory's failure to pay the monies owed for the parts it bought from Toyota was a significant event in Toyota's determination that Victory was no longer financially solvent and what "drove [Toyota's] decision to issue a termination [notice] on October 15th ... for insolvency." (Tr. 206.)

8. Victory's Controller, Edward DiGilio acknowledged at his deposition, taken prior to the preliminary injunction hearing, that Victory's liabilities had exceeded its assets as of September 2008 and continuing through the date of his deposition—March 24, 2009—and that Victory was unable to pay its debts as they became due. (DiGilio Dep. 61.) In addition, Victory's year-end financial statement for 2008 indicates a net loss of $735,000. (Tr. 129; Def. Ex. N.)

On November 28, 2008, Victory received a third notice of termination from Toyota, advising of two additional grounds for termination: (1) failure to maintain the required net working capital, and (2) failure to maintain an adequate floor plan. (Tr. 145; Def. Ex. R.) The third notice of termination set forth the effective date of termination as ninety (90) calendar days from the date of the letter. (Def. Ex. R.)

By letter dated December 19, 2008, and based on an agreement reached by the parties, Toyota extended Victory's termination date to the close of business on January 19, 2009.[9] (Tr. 114, 215–17; Def. Ex. L.) On January 19, 2009, Toyota terminated Victory's Dealer Agreement. (Tr. 218–19.)

Victory commenced the within action on January 20, 2009–one day after the Dealer Agreement was terminated. On January 21, 2009, Judge Seybert issued Victory a temporary restraining order. In conformance with that order, Toyota reinstated its business relationship with Victory. (Tr. 219.)

CONCLUSIONS OF LAW

I. *The New York Franchised Motor Vehicle Dealer Act*

Pursuant to a recent amendment to the New York Franchised Motor Vehicle Dealer Act (the "Act"), "[a]ny franchised motor vehicle dealer who receives a written notice of termination," and seeks to challenge the "threatened termination" in an action "commenced within four months of receipt of the notice," is entitled to a "stay" of "the proposed termination . . . until the final judgment has been rendered." N.Y. Veh. & Traf. Law § 463(2)(e)(1). This amend-

ment (referred to as the "Automatic Stay Provision") became effective on January 1, 2009.

Victory argues that it is entitled to the protection of the Automatic Stay Provision in the within action because it filed its Complaint herein within four months of its receipt of the October 15, 2008 notice of termination issued by Toyota. Toyota argues that Victory should receive no such benefit.

The parties go to great lengths to debate whether the legislature intended for the Automatic Stay Provision of the Act to be applied retroactively or prospectively. However, based on the plain language of the statute, I find such arguments irrelevant. The Automatic Stay Provision states very clearly that a motor vehicle dealer challenging a *"threatened termination"* shall be entitled to a stay of that *"proposed termination."* N.Y. Veh. & Traf. Law § 463(2)(e)(1) (emphasis added). Accordingly, the plain language of the statute indicates that the Automatic Stay Provision only applies in cases where the termination of the dealership has not yet occurred. That is not the situation here.

Here, Toyota terminated Victory's Dealer Agreement on January 19, 2009. By both parties' accounts, the "dealer code" was terminated as of close of business on that day and Victory ceased to operate as an authorized Toyota dealer, meaning that Victory could no longer purchase anything from Toyota and Toyota could no longer sell anything to Victory. (Tr. 143–44 218–19.) Victory, however, did not commence the within action until January 20, 2009, one day after Toyota terminated its Dealer Agreement. Accordingly, at the time that

---

**9.** Victory received a fourth notice of termination on March 24, 2009, after the commencement of the within action, based on the issuance of the temporary restraining order by the state court, prohibiting Victory from delivering any new or used vehicles to customers. (Tr. 147; Def. Ex. S.) As stated *supra,* it was unclear at the time of the preliminary injunction hearing whether this restraining order is still in effect.

Victory instituted this lawsuit, there was no "threatened" or "proposed" termination. Rather, the termination had already taken place and Victory was no longer a "franchised motor vehicle dealer."

Victory received notice of Toyota's intent to terminate its dealership in October 2008. Although the date of termination was extended several times, as of December 19, 2008, Victory knew that Toyota would be terminating its Dealer Agreement at the close of business on January 19, 2009. The Automatic Stay Provision that Victory now seeks to avail itself of went into effect on January 1, 2009. Therefore, Victory had ample time between January 1, 2009 and January 19,

2009 to commence the within action and invoke the protection of the Automatic Stay Provision. Victory simply failed to do so, waiting instead until after the termination was already carried out.[10] As a result, the Automatic Stay Provision of the Act is inapplicable here and Victory is not entitled to any stay of termination. Instead, to obtain relief herein, Victory must demonstrate that it has satisfied the prerequisites for a preliminary injunction.

## II. *Legal Standard for a Preliminary Injunction*

 A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies" and "should not be routinely granted." *Hanson Trust PLC v.*

---

**10.** In an effort to reopen the preliminary injunction hearing to introduce new evidence, Victory submitted a motion on April 24, 2009, arguing that New York General Construction Law Section 25 extended the effective date of termination to January 20, 2009 because January 19, 2009 was a holiday—Martin Luther King, Jr. Day. Section 25 of New York General Construction Law provides as follows:

> Where a contract by its terms authorizes or requires the payment of money or performance of a condition on a Saturday, Sunday or a public holiday, or authorizes or requires the payment of money or the performance of a condition within or before or after a period of time computed from a certain day, and such period of time ends on a Saturday, Sunday or a public holiday, unless the contract expressly or impliedly indicates a different intent, such payment may be made or condition performed on the next succeeding business day ....

N.Y. Gen. Const. Law § 25(1). Here, however, the December 19, 2008 agreement of the parties, which extended Victory's termination date, unequivocally stated that "the effective date of the October 15, 2008 notice of termination of Victory's Toyota Dealer Agreement ... shall be further extended until the close of business on January 19, 2009." (Def. Ex. L.) Accordingly, there was no "condition" to be performed, nor was there any "period of time" to be computed. Section 25 of the General Construction Law is therefore inap-

plicable. *See Harrison v. Allstate Ins. Co.*, No. 98–CV–2791, 1999 WL 638243, at *2, 1999 U.S. Dist. LEXIS 12862, at *5 (E.D.N.Y. Aug. 18, 1999) ("In keeping with the language of § 25, courts have declined to extend a contractual limitations period ending on a Saturday, Sunday or legal holiday only when the contract did not require money to be paid or a condition to be performed ...."). The parties agreed upon January 19, 2009 as the termination date. The fact that the date chosen happened to fall on a holiday does not extend the effective date of the termination. *See Lesk v. London & Lancashire Indem. Co.*, 286 N.Y. 443, 448, 36 N.E.2d 655 (1941) (finding that General Construction Law § 25 did not extend contract's expiration date where contract expired on a specific date, which was a legal holiday, and did not require payment of money or performance of a condition); *Freda Green & Assoc., Inc. v. Heydt*, 167 A.D.2d 328, 562 N.Y.S.2d 79, 79 (1st Dep't 1990) (rejecting plaintiff's claim that New York General Construction Law § 25 extended the expiration date of the parties' contract because it "fell on a Sunday" and stating that the agreement "required no 'payment of money' or 'performance of a condition' warranting such an extension of time") (citing *Kulanski v. Celia Homes, Inc.*, 7 A.D.2d 1006, 184 N.Y.S.2d 234, 237 (2d Dep't 1959), which states that Section 25 of the General Construction Law "is of no avail ... when 'the contract expressly or impliedly indicates a different intent' ").

*ML SCM Acquisition, Inc.,* 781 F.2d 264, 273 (2d Cir.1986) (quoting *Med. Soc'y of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977)). In order to obtain a preliminary injunction, the movant must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in the movant's favor. *See Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). The purpose of a preliminary injunction is to prevent hardship and preserve the status quo until final determination of the action. *See Warner-Vision Entm't v. Empire of Carolina, Inc.,* 101 F.3d 259, 261–62 (2d Cir.1996). Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *Metro Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union,* 239 F.3d 172, 177 (2d Cir. 2001).

■ Whereas a preliminary injunction preserves the status quo, a "mandatory injunction" alters the status quo by "commanding some positive act." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995). As a result, a plaintiff who seeks a mandatory injunction is required to meet a "more rigorous likelihood-of success standard." *Nicholson v. Scoppetta,* 344 F.3d 154, 165 (2d Cir.2003) (quoting *Fair Hous. in Huntington Comm., Inc. v. Town of Huntington,* 316 F.3d 357, 365 (2d Cir.2003)) (additional citation omitted). As the Second Circuit has stated, "a mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Tom Doherty Assoc.,* 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985)) (internal citations omitted). Under this standard, the "traditional formula" for a preliminary injunction is altered by the requirement that "the movant demonstrate a greater likelihood of success [on the merits]." *Tom Doherty Assoc.,* 60 F.3d at 34. As with a traditional preliminary injunction, the plaintiff is also required to demonstrate irreparable harm. *See Daly v. U.S. Fencing Assoc.,* No. CV 07–1167, 2007 WL 1120461, at *2, 2007 U.S. Dist. LEXIS 28092, at *7 (E.D.N.Y. Apr. 16, 2007) (citing *Forest City Daly Housing, Inc. v. Town of N. Hempstead,* 175 F.3d 144, 149 (2d Cir.1999)) (additional citation omitted); *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.,* No. 99 Civ. 0213, 1999 WL 123501, at *5, 1999 U.S. Dist. LEXIS 2353, at *14 (S.D.N.Y. Mar. 2, 1999) (citing *Abdul Wali,* 754 F.2d at 1026) (additional citation omitted).

In the within action, Victory's Toyota franchise has already been terminated. Therefore, Victory's application for injunctive relief does not seek to maintain the status quo but instead essentially seeks to reinstate its Dealer Agreement with Toyota, on the grounds that Toyota did not have due cause to terminate the dealership. Accordingly, although not addressed by either party, I find that Victory is actually requesting the issuance a mandatory injunction and the heightened standard discussed *supra* must be applied.

### III. *Irreparable Harm*

" 'Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision

on the merits can be rendered.'" *Bell & Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 431 (1973) and citing cases). Such irreparable harm must be "actual and imminent" and "not remote or speculative." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (citation omitted). Irreparable harm has been found in circumstances where a party is threatened with the loss of a business, *see Tom Doherty Assocs.*, 60 F.3d at 37, or where the threatened termination of delivery of a unique product would inevitably result in irreparable damage to the good will of the distributor, *see Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–908 (2d Cir.1990). However, it is well-established that "irreparable injury means injury for which a monetary award cannot be adequate compensation." *Jackson Dairy*, 596 F.2d at 72. Accordingly, "where money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law." *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir.1986) (citation omitted).

Victory argues that it will be irreparably harmed if its Dealer Agreement with Toyota is not reinstated because the value of the dealership will essentially be zero and the franchise will be unsaleable. However, as amply demonstrated by both Victory and Toyota at the preliminary injunction hearing, there is already no value to Victory's franchise. Victory's liabilities significantly outweigh its assets. Victory is unable to pay any of its outstanding debts and, as a result, has voluntarily filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.[11] Moreover, while it is not clear whether the state court temporary restraining order is still in effect, up until at least one week before the preliminary injunction hearing, Victory was prohibited from delivering any new or used vehicles to its customers. Even if the restraining order has in fact

---

**11.** It should be noted that, prior to the start of the evidentiary hearing held on March 30, 2009, counsel for plaintiff requested that the within action be stayed as a result of Victory's bankruptcy filing, pursuant to the automatic stay provision of the United States Bankruptcy Code, 11 U.S.C. § 362. (Tr. 2–3.) The undersigned denied Victory's request at that time. (Tr. 10–12.) Victory renewed its request by letter motion dated April 17, 2009, relying almost entirely on an earlier action presided over by Judge Seybert, *In re The Motorcycle Excellence Group, Inc.*, 365 B.R. 370 (Bankr.E.D.N.Y.2006), in which the automatic stay was imposed where the plaintiff's BMW motorcycle franchise agreement was considered an asset of the bankruptcy estate. The *Motorcycle Excellence* case, however, is quite different than the within action. In that case, the plaintiff commenced litigation against BMW on November 14, 2005—two days prior to the date on which its franchise was to be terminated. *See id.* at 374. On November 16, 2005, the plaintiff was granted a temporary restraining order by Judge Sey-

bert, which stayed BMW's termination of the franchise. *See id.* at 374–75. On November 18, 2005, the plaintiff in *Motorcycle Excellence* filed for bankruptcy. *See id.* at 374. As a result of Judge Seybert's issuance of a temporary restraining order, the franchise agreement was not terminated as of the date of the bankruptcy filing and therefore was considered to be an asset of the bankruptcy estate, and subject to the automatic bankruptcy stay. *See id.* at 382. Here, however, as discussed *supra*, Victory's Dealer Agreement terminated on January 19, 2009—the day before Victory commenced the within action. Victory did not file for bankruptcy until March 30, 2009. Since Victory's franchise agreement no longer existed at the time Victory instituted this action, and had not done so for more than one month prior to its bankruptcy filing, it cannot be considered an asset of the bankruptcy estate, subject to the provisions of the automatic stay. As a result, Victory's request to stay this action, pursuant to the automatic bankruptcy stay, should be denied.

been lifted, Victory no longer has a floor plan lender from which it can purchase automobiles for sale to customers. In addition, although Victory has attempted to find a buyer for the dealership, no such sale has been able to be negotiated and there is no indication that there are any willing purchasers on the horizon.

Accordingly, since the evidence clearly demonstrates that Victory is no longer a viable business entity, the denial of injunctive relief herein will not irreparably harm Victory. While the Court is sympathetic to the position Victory has found itself in, much of its current crisis is a product of its own poor financial decisions. Since Victory "has created its own hardship ... [Toyota] cannot be taxed with it." *Lazar's Auto Sales*, 1999 WL 123501, at *8, 1999 U.S. Dist. LEXIS 2353, at *23 (denying preliminary injunction to automobile dealerships whose financing was terminated due to poor financial status and who failed to attempt to obtain alternate financing).

Moreover, "it is apparent from this record that there is no realistic probability that plaintiff's business will continue in the future." *Daly*, 2007 WL 1120461, at *3, 2007 U.S. Dist. LEXIS 28092, at *10. It is undisputed that, pursuant to the Dealer Agreement, Toyota has the right to terminate the franchise agreement upon sixty (60) days written notice for Victory's failure to maintain "the required net working capital" or an "adequate flooring line." (Def. Ex. A § XXIII(B)(2)(d).) By a notice of termination dated November 28, 2008, Toyota informed Victory of its intention to terminate the Dealer Agreement in ninety (90) calendar days—more notice than is even required under the Dealer Agreement—for Victory's failure to maintain the required net working capital or an

adequate floor plan line of credit. (Def. Ex. R.) By its terms, the November 28, 2008 notice of termination became effective on March 2, 2009. Victory has not challenged the November 28, 2008 notice of termination in any way. Rather, the Complaint in this action pertains only to the October 20, 2008 notice of termination, which listed Victory's insolvency and its failure to pay monies owed to Toyota as the grounds for termination. (Compl. ¶¶ 16, 28.) Accordingly, even if Victory were successful in its claim that Toyota lacked due cause to issue the October 20, 2008 notice of termination, Victory's relationship with Toyota would still have ceased as of March 2, 2009. "The absence of any prospects for continuing [Victory's] business militates against a finding that in the absence of injunctive relief plaintiff will suffer irreparable harm based on the loss of his business." *Daly*, 2007 WL 1120461, at *3, 2007 U.S. Dist. LEXIS 28092, at *11 (denying preliminary injunction where "even if the plaintiff prevail[ed] on the merits at trial and [could] show that the Agreement was not properly terminated in May 2006, his relationship with the defendant [would] not continue beyond July, 2007.").

## IV. *Clear Showing of a Likelihood of Success on the Merits*

Even if Victory could establish irreparable harm, it would still be unable to meet the heightened likelihood of success standard necessary for the issuance of a mandatory injunction. The only claim in its Complaint that Victory appears to still be pursuing is the cause of action alleging that Toyota did not have due cause to issue the October 20, 2008 notice of termination based on Victory's insolvency.[12] Victory

---

12. Cirillo's testimony at the preliminary injunction hearing directly contradicts the remaining claims in the Complaint pertaining to Toyota's alleged lack of good faith. (Tr. 142–44.)

has not made a clear showing that it will ultimately prevail on this claim.

As stated *supra*, the evidence submitted by both parties at the preliminary injunction hearing established unequivocally that Victory's liabilities outweigh its assets and that Victory is unable to pay its debts as they become due. The accounting firm engaged to conduct an analysis of Victory's finances found that as of October 2008, Victory's debts amounted to approximately $11 million, while its assets only amounted to approximately $10 million. In fact, Cirillo himself testified that Victory currently owes millions of dollars in outstanding debt, including monies owed to its floor plan lender, M & T, New York State, Toyota, Toyota's financing arm—Toyota Motor Credit—the previous owner of the dealership and other "vendors." In addition, Cirillo testified that the mortgage on the property on which the dealership sits is currently in default for non-payment. Victory is unable to make payments on the debts it has due and owing and has been unable to make such payments since at least July 2008. In fact, Victory's financial position has deteriorated to such an extent, that it voluntarily filed for bankruptcy protection hours before the preliminary injunction hearing held before the undersigned. By its own testimony and actions, Victory has established that it is in fact insolvent, and has been so for quite some time. Accordingly, Victory is not likely to prevail on its claim that Toyota did not have due cause to issue a notice of termination based on insolvency.[13]

Moreover, regardless of Victory's solvency, or lack thereof, Toyota had ample grounds to terminate its Dealer Agreement with Victory. Victory lost its floor plan financing, which prevented it from being able to obtain any automobiles to sell to customers, the very purpose for which the dealership was even created. Victory was also unable to pay Toyota for the parts it was ordering on credit and when Toyota attempted to collect on the debt, there were insufficient funds on account to cover the debt. Victory also failed to pay Toyota for the TRAC cars it had in its possession, resulting in Toyota having to essentially repossess them. In addition, two of those vehicles were unable to be returned to Toyota because Victory failed to pay a body shop for repairs performed on them, resulting in the body shop placing liens on the vehicles and eventually obtaining titles to them after auction. All of the foregoing constitute grounds for termination under Victory's Dealer Agreement with Toyota. Based on the testimony and evidence presented at the preliminary injunction hearing, I find that Toyota had more than ample cause to terminate its franchise relationship with Victory.

Accordingly, Victory has failed to establish that it is likely to succeed on the merits of its action under the traditional requirements for a preliminary injunction, let alone under the heightened standard

---

13. Victory belatedly attempted to demonstrate its solvency by introducing the testimony of Alan Richards ("Richards"), Victory's attorney and a member of the firm that performs Victory's accounting work, that the franchise itself has "good will" or "blue sky" value of approximately $2 to $3 million. (Tr. 167, 178.) This testimony was offered at the evidentiary hearing held before the undersigned on April 1, 2009. I do not credit this testimony. Frank Funai, the accountant from Deloitte & Touche, whose testimony I credit, conducted the financial analysis of Victory in November 2008 and testified that Victory does not have any good will. (Tr. 242.) Moreover, Victory's petition for voluntary bankruptcy under Chapter 11, filed on March 30, 2009, expressly states that Victory's assets, as of February 23, 2009, amount to $8,236,410.80, while its liabilities, as of that same date, equal $10,659,530.69. *See In re J.P.T. Automotive, Inc.*, No. 09–72097, Ex. A to Voluntary Petition (Bankr.E.D.N.Y.). Clearly, Victory is insolvent.

for a mandatory injunction. Based on the foregoing, I recommend that Victory's motion for preliminary injunctive relief be denied in its entirety.

RECOMMENDATION

For the foregoing reasons, I recommend that the plaintiff's motion for a preliminary injunction be denied.

OBJECTIONS TO THIS REPORT<br>AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of the date of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), and 72(b); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.1992), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

**SO ORDERED:**

Dated: Central Islip, New York.

June 3, 2009.