**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: October 15, 2008

Decided: June 19, 2009
Errata Opinion filed: July 14, 2009)

Docket No. 07-2872-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ZINO DAVIDOFF SA,

*Plaintiff - Appellee,*

v.

CVS CORPORATION,

*Defendant - Appellant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:  LEVAL, KATZMANN, and LIVINGSTON, *Circuit Judges*.

Defendant appeals from a preliminary injunction ordered by the United States District Court for the Southern District of New York (Karas, *J.*), which enjoined defendant, *inter alia,* from selling plaintiff's trademarked products with the unique production code removed.  The Court of Appeals (Leval, *J.*) affirms.  Because the production codes play an important role in helping the trademark owner to guard against counterfeits and protect the reputation of the mark, the district court properly found that its unauthorized removal by a seller could justify a finding

1

of trademark infringement.

LISA PEARSON (Christopher Lick, *on the brief*; Adam H. Charnes and W. Andrew Pequignot, *of counsel*), Kilpatrick Stockton LLP, New York, NY, for *Plaintiff-Appellee*.

MEGAN MUOIO (Nicholas Fortuna, *on the brief*), Allyn & Fortuna LLP, New York, NY, for *Defendant-Appellant*.

LEVAL, *Circuit Judge*:

Defendant CVS Corporation, a retail drugstore chain, appeals from the order of the United States District Court for the Southern District of New York (Karas, *J.*), granting to plaintiff Zino Davidoff SA ("Davidoff"), a Swiss corporation, a preliminary injunction which enjoined CVS from dealing in any way in trademarked goods of the plaintiff with Davidoff's unique production code ("UPC") removed.[1] The district court found that the plaintiff was likely to succeed on the merits of its trademark infringement claim because the UPC acts as a quality control mechanism which enables Davidoff to protect the reputation of its trademarks by identifying counterfeits and by protecting against defects. We agree and affirm the district court's order.

## BACKGROUND

---

[1] The order also enjoined CVS from a number of activities concerning counterfeit Davidoff products, and from tampering with or destroying business records related to such activities. That part of the order is not at issue in this appeal.

Davidoff has been a well-regarded brand for high-end luxury goods for personal consumption since 1911. In 1988, Davidoff launched DAVIDOFF COOL WATER, a cologne for men, followed by a COOL WATER fragrance for women in 1997. Davidoff holds valid uncontested trademarks for all of the COOL WATER products at issue in this case. The COOL WATER fragrances are manufactured and marketed by Coty Inc. ("Coty") and its subsidiaries, under license from Davidoff.

Davidoff and Coty together have developed a comprehensive quality assurance and anti-counterfeiting program. Part of this program involves the placement of a unique production code on the bottom of each COOL WATER fragrance bottle and on the bottom of its corresponding package. As its name suggests, the UPC is a multi-digit code unique to each unit. Embedded within the code is a variety of information about that particular unit, such as the time and place of production, the production line, ingredients used, etc.

Davidoff's use of the UPC plays an important role in fighting counterfeits. Because of the high expense involved in placing a unique number on each unit, counterfeiters will generally either omit such a number from their packaging or repeatedly use sets of fake numbers on a series of counterfeit units. The UPC system therefore facilitates the spotting of counterfeit units by allowing investigators to make a determination based on the absence of a UPC on the packaging or the use of a repeating and, thus, fake UPC number. Also, the identification of a fake UPC number allows investigators to search for other fakes merely by identifying products bearing the

3

same fake number. Furthermore, Davidoff's own investigators are not the only recipients of these benefits. Davidoff regularly instructs its retailers and officers of U.S. Customs and Border Protection ("Customs") in the use of the UPC system and relays information regarding fake UPC numbers known to be used by counterfeiters. Armed with this knowledge, Customs and retailers are more easily able to check newly-received COOL WATER shipments and set aside suspected counterfeits.

Use of the UPC system also assists Davidoff's ability to protect its brand against quality slippage in genuine authorized products. When a quality problem surfaces, the UPC identifies the place of manufacture, the batch which produced the defect, and other identifying information. This information helps Davidoff both to recall already distributed product that may share the defect and to prevent further recurrence of the defect. The ability derived from the use of the UPC helps Davidoff assure that its marks will not appear on defective product and thus preserve and protect the value of its trademarks.

In an effort to maintain the prestige of its brand, Davidoff limits sales of COOL WATER products to luxury retailers and has declined to sell to CVS. Though not an authorized retailer, CVS is nonetheless able to secure stock of COOL WATER from outside of Davidoff's normal distribution channels. Davidoff products are among CVS's top-selling fragrances. Some of the COOL WATER fragrances sold by CVS have been found to be counterfeit. In addition, some of the COOL WATER stock purchased by CVS that is not counterfeit consists of gray-market

goods, meaning "goods that are manufactured [under authorization from the trademark owner], are legally purchased [outside the United States] from authorized distributors, and are then imported by persons other than the trademark holder and without the markholder's permission." *Olympus Corp. v. United States*, 792 F.2d 315, 317 (2d Cir. 1986).

On two occasions, in 1998 and 2005, Davidoff discovered that counterfeit COOL WATER products were being sold at CVS. On both occasions, Davidoff sent cease-and-desist letters to CVS and provided information to CVS on how to identify counterfeits based on the product's UPC. CVS assured Davidoff that it would conduct an inventory review, remove all counterfeit products, and source only from authorized distributors. Despite these assurances, Davidoff discovered in 2006 that CVS was continuing to sell counterfeit COOL WATER fragrances. Davidoff then brought this action against CVS alleging, *inter alia*, trademark infringement, unfair competition, and trademark dilution in violation of Sections 32(1) and 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a) and 1125(c).[2] Davidoff's original

[2] Section 32(1) of the Lanham Act provides, in part, that "[a]ny person who . . . without the consent of the registrant . . . use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods [that] is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action." 15 U.S.C. § 1114(1). In addition, Section 43(a) of the Act provides that "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . by another person . . . shall be liable in a civil action." 15 U.S.C. § 1125(a)(1). Finally, Section 43(c) of the Act provides that "the owner of a famous mark that is distinctive . . . shall be entitled to an injunction against another person who . . . commences use of a mark . . . in commerce that is likely to cause

complaint sought relief only as to CVS's marketing of counterfeit Davidoff products. On December 22, 2006, the district court granted a temporary restraining order and authorized Davidoff to inspect all undistributed products in CVS's inventory bearing the Davidoff mark.

During the course of this inspection, Davidoff discovered that, in the case of 16,600 items in CVS's inventory, the UPCs on the packages and labels affixed to the bottle had been removed.[3] The codes had been removed through a variety of techniques, including cutting the portion of the box or label exhibiting the UPC, using chemicals to wipe away the UPC on the label, and grinding away the bottom of the bottles to remove the UPC. It was apparent in many instances that the packaging had been opened.

On February 7, 2007, Davidoff amended its complaint to include also claims for relief based upon CVS's sale of Davidoff products with the UPC removed. On March 2, 2007, CVS voluntarily agreed to halt the sale of counterfeit Davidoff products, but not the products with the codes removed. Davidoff then moved for a preliminary injunction forbidding the sale of all its trademarked goods with code removed. The court granted Davidoff's motion. *Zino Davidoff SA v. CVS Corp.*, No. 06-cv-15332, 2007 WL 1933932 (S.D.N.Y. July 2, 2007). The court reasoned that removal of the codes from Davidoff's trademarked product impaired Davidoff's marks by

---

dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

[3] Davidoff has not tested the 16,600 products at issue, and therefore is not yet able to determine how many, if any, are counterfeit.

interfering with the trademark owner's ability to identify counterfeit goods and to control the quality of its legitimate products by identifying and recalling defective products. The court thus concluded that Davidoff was likely to succeed on the merits of its trademark infringement claims on the theory that CVS's sale of Davidoff's trademarked products with the codes removed constituted trademark infringement. CVS brought this appeal.

## DISCUSSION

We review a district court's grant of a preliminary injunction for abuse of discretion. *Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008).

> In cases involving claims of trademark infringement and dilution, as in other types of cases, a party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000). CVS argues that Davidoff failed to establish a likelihood of success on the merits and would not suffer irreparable harm in the absence of an injunction. We disagree and affirm the district court's grant of a preliminary injunction.

## I. Trademark Infringement

CVS contends that the district court erred in ruling that Davidoff is likely to succeed on the merits of its trademark infringement claims. CVS asserts that the goods with the codes removed are gray-market goods – *i.e.*, genuine Davidoff goods sold by Davidoff through

authorized channels in other countries and subsequently imported by others into the United States. Because these goods are sold in their original packaging with the Davidoff trademarks clearly visible and unaltered, CVS contends that the removal of the codes does not negate their genuineness or constitute infringement. CVS's argument misses the point. The fact that the goods in question may be gray-market goods does not furnish CVS with a valid defense. The question before us is not whether, or under what circumstances, the sale of gray-market goods infringes their trademark. The district court did not justify its grant of a preliminary injunction by the proposition that the goods authorized by Davidoff for sale in another country are not genuine when sold in the United States. The injunction was justified rather on the basis that the removal of Davidoff's codes interfered unlawfully with Davidoff's trademark rights regardless of whether the goods were originally authorized by Davidoff for sale in the United States or elsewhere.

CVS argues that neither the plain text nor the legislative history of the Lanham Act supports the district court's conclusion that a retailer may be found liable for trademark infringement for selling a genuine product in its original packaging with the registered trademark intact, simply because the mark holder's production code has been altered or removed. In support of its argument, CVS points to past failed legislative attempts seeking to amend the Lanham Act to include a prohibition on the alteration or removal of production codes.

To the extent CVS's argument rests on the failed efforts to amend the governing statutes,

we reject it. The Supreme Court has cautioned that "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 187 (1994) (internal quotation marks omitted). "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Id*. (internal quotation marks omitted). The fact that proponents of a particular view sought unsuccessfully to have a statute amended to state a proposition with unmistakable clarity tells nothing about whether the preexisting law already covered the point, albeit less clearly.

In our view, furthermore, the district court correctly found that Davidoff was likely to succeed on the merits in its contention that CVS's sales of its products with the UPC removed constituted trademark infringement. We recognize that, as a general rule, the Lanham Act does not impose liability for "the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner" because such a sale does not inherently cause confusion or dilution. *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992). However, we have held that goods are not genuine if they do not conform to the trademark holder's quality control standards, *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994), or if they differ materially from the product authorized by the trademark holder for sale, *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.,* 816 F.2d 68, 73 (2d Cir. 1987).

Where the alleged infringer has interfered with the trademark holder's ability to control

quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). In attaching its mark to its goods over time, a holder assures consumers that the goods conform to the mark holder's quality standards. Reputation for quality, whether good or bad, becomes associated with a mark in the minds of consumers. Many consumers are willing to pay more to buy goods bearing a mark which experience has taught the consumer represents an assurance of high quality.

Davidoff asserts that its codes serve as a control of quality in two ways: (1) the codes permit the easy detection of counterfeits, and (2) they improve Davidoff's ability to identify defective products, effectuate a targeted recall, and remedy production defects. We ruled in *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996), that a trademark holder is entitled to an injunction against one who would subvert its quality control measures upon a showing that (i) the asserted quality control procedures are established, legitimate, substantial, and nonpretextual, (ii) it abides by these procedures, and (iii) sales of products that fail to conform to these procedures will diminish the value of the mark. *Id*. at 6. The district court found that these requirements were met. We agree.

**1. Detection of Counterfeits**

Because the creation of unique production codes for each package is expensive, counterfeiters often either omit the UPC altogether or use sets of identical bogus codes on numerous packages. Davidoff's evidence showed that the UPC system facilitates its ability to identify counterfeit Davidoff products by allowing it to scan for products which either lack a UPC or exhibit a UPC known to be used by counterfeiters. The district court found that Davidoff regularly trains retailers, private investigators, and U.S. Customs to use UPCs in this manner to identify and seize counterfeit goods. As a result, it determined that the first two prongs of the *Warner-Lambert* formulation were met because the procedures were "legitimate, substantial, and nonpretextual" and Davidoff "abides by these procedures." The district court concluded that the third prong was also met because the loss of these protections against counterfeits would expose Davidoff to a higher incidence of substantial sales of counterfeit goods, which are invariably non-conforming and inferior, and thus harm Davidoff's reputation and diminish the value of its trademark.

CVS argues that the presence or absence of a UPC on a particular unit of a Davidoff product does not prove the unit's authenticity or lack thereof, and as a result, cannot be considered a legitimate quality control procedure. The argument again misses the point. The code system enhances the effectiveness of Davidoff's ability to detect and prevent the sale of counterfeits. Removal of the codes makes it more difficult to detect counterfeits. Regardless of whether the presence or absence of a code on an individual unit of Davidoff product establishes

the authenticity of that unit, the removal of the codes exposes Davidoff to an increased risk that any given unit sold at retail will be counterfeit. Davidoff adequately showed that the affixation of the code is a legitimate, substantial, non-pretextual procedure to detect counterfeits, that it abides by the procedure, and that removal of the codes exposes it to a realistic risk of increased incidence of counterfeits with resultant damage to the reputation of its mark. That showing was sufficient to support the court's grant of the preliminary injunction.

### 2. Identification of Defective Products and Effective Recall

The district court also based its finding on the role Davidoff's code system plays to help protect against quality defects in genuine Davidoff products. Embedded within the UPC numbers are several pieces of information about the product, including where and when it was produced and ingredients used. Davidoff showed that this information could assist its quality controls in several ways. When a defect in quality is discovered in a particular item, reference to the code helps identify the source of the problem and thus facilitates correction. Furthermore, when a quality problem is discovered, the code system permits easy, rapid identification of affected product already in the chain of distribution, so as to facilitate a targeted recall that will remove the defective goods from the channels of commerce while leaving unaffected goods in place.

CVS contends the code system is merely pretextual. First, CVS notes that the UPC is minimized in small print at the bottom of the box and bottle, and Davidoff's retailers and customers are not made aware of it. Second, CVS points out that Davidoff has never enacted a

targeted recall of the type that the UPC system is allegedly designed to facilitate. Thus, CVS contends that Davidoff's quality control claims are pretextual and that the true purpose of the UPC system is to allow Davidoff to search out gray-market goods.

These arguments are not convincing. Whether Davidoff's retailers and consumers are aware of how to obtain information from the UPC number is of no significance. The codes are designed to assist Davidoff and its agents in quality control and the detection of counterfeits as described above. Whether consumers and/or retailers understand the codes is irrelevant to the codes' performance of their function. Moreover, if the need arose, Davidoff could seek the assistance of retailers and consumers by instructing them to look for units whose UPC numbers are associated with the problem.

The district court properly relied on the testimony of Davidoff's Vice President for Regulatory Affairs and Quality Assurance, among others, as support for Davidoff's actual use of the asserted quality control procedure. This testimony revealed that Davidoff had, on multiple occasions, relied on the UPC system to assist with quality issues, including under-filled or over-filled bottles, defective dispensers, and improper packaging. The fact that none of these instances resulted in a large-scale recall does not help CVS. To the contrary, an important benefit of the UPC system is that it permits Davidoff to keep recalls small and targeted.

Nor does the fact that the UPC system also may allow Davidoff to ensnare distributors operating outside the authorized distribution and retail network and to identify importers of gray-market goods defeat its claim. What matters is whether Davidoff's codes are a bona fide control

device upon which Davidoff actually relies. If the codes served only to help Davidoff exert control over the distribution and sales network, different questions would arise. But the mere fact that the UPC system provides Davidoff additional benefits that may be unrelated to quality control does not negate its legitimate function in protecting Davidoff's marks from quality defects and counterfeiting.

CVS also argues Davidoff has not shown that any of CVS's sales involved inferior product. CVS notes that the purpose of the injunction in *Warner Lambert* was to protect the mark holder against distribution of stale, inferior cough drops. *See Warner Lambert*, 86 F.3d at 7-8 & n.1. It contends no such issue is at stake here.

For at least two reasons, CVS's argument is meritless. First, such proof is unnecessary. In *El Greco*, we clearly articulated that, for purposes of analyzing trademark infringement involving interference with quality control procedures, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *El Greco*, 806 F.2d at 395. The mark holder is entitled to protection against acts that subvert its ability to protect the reputation of its marks by exercising quality controls.

Second, it is untrue that none of CVS's sales of product with code removed involve inferior product. Characteristically, sellers of luxury goods, such as fragrances, go to great length and expense to present the trademarked merchandise in appealing packaging. For a seller to damage the packaging by cutting away portions or applying acids to blur markings detracts from the value of the product. The evidence showed that removal of the UPC required tampering – the

14

cutting of packaging, the application of chemicals to wipe away the labeling, and the grinding of the bottles – all of which is visible to a consumer. It is a logical inference that consumers may regard a product whose packaging has been tampered as inferior and perhaps suspicious. Mutilation of packaging to conceal markings may lead the consumer to suspect that the item is stolen merchandise, or is defective and has been diverted from a recall, or is otherwise untrustworthy. Furthermore, fragrances are often purchased to be offered as romantic gifts. Mutilated packaging makes the item less appealing to such a purchaser, who runs the risk that the gift will be viewed by the recipient as a sketchy, cheap purchase from an illicit source or of the sort given by Tony Soprano to Carmela. In short, trademarked goods whose luxury packaging is damaged are materially different from those that are intact. *Accord Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1303-04 (11th Cir. 2001).

Thus, Davidoff is likely to succeed in its trademark infringement claim not only on the basis of CVS's interference with Davidoff's quality control, but because CVS is selling under Davidoff's mark goods that are materially different from Davidoff's genuine trademarked product. *See Original Appalachian Artworks*, *Inc.*, 816 F.2d at 73 (enjoining the sale of gray-market products which are "materially different" because such sales constitute trademark infringement). In the context of gray-market goods, in comparing the trademark holder's product with the gray-market product, we apply a low threshold of materiality, requiring no more than a slight difference which consumers would likely deem relevant when considering a purchase of the product. *Accord Bourdeau Bros. v. Int'l Trade Comm'n*, 444 F.3d 1317, 1323 (Fed. Cir.

2006); *Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992) ("Any higher threshold would endanger a manufacturer's investment in product goodwill and unduly subject consumers to potential confusion by severing the tie between a manufacturer's protected mark and its associated bundle of traits."). The damage to the packaging furnishes an additional basis, over and above the detriment to the mark holder's ability to detect counterfeits and to guard against defects, to justify the grant of the preliminary injunction.

**II. Irreparable Injury**

We have previously held that a "plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005). The district court found that Davidoff had established a likelihood of confusion and was thus entitled to this presumption. CVS argues on appeal that the district court did not adduce evidence sufficient for it to conclude that consumers were likely to be confused by CVS's sale of decoded gray-market Davidoff products. We disagree. Even without the benefit of a presumption, Davidoff's evidence showed a likelihood that the absence of codes increased the risk that consumers would unwittingly purchase counterfeit or defective product because of the disabling of Davidoff's device to guard against these things.

We find neither error nor abuse of discretion in the district court's grant of the preliminary injunction.

**CONCLUSION**

16

The district court's order for a preliminary injunction is hereby AFFIRMED.