PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GEORGIA PACIFIC CONSUMER
PRODUCTS, LP,

        *Plaintiff-Appellant,*

        v.

VON DREHLE CORPORATION, a North
Carolina corporation,

        *Defendant-Appellee.*

No. 09-1942

GEORGIA PACIFIC CONSUMER
PRODUCTS, LP,

        *Plaintiff-Appellee,*

        v.

VON DREHLE CORPORATION, a North
Carolina corporation,

        *Defendant-Appellant.*

No. 09-2054

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:05-cv-00478-BO)

Argued: May 11, 2010

Decided: August 10, 2010

Before KEENAN, Circuit Judge, HAMILTON, Senior
Circuit Judge, and Samuel G. WILSON, United States
District Judge for the Western District of Virginia,
sitting by designation.

Vacated and remanded in part and affirmed in part by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Keenan and Judge Wilson joined. Judge Wilson wrote a separate opinion concurring specially.

---

**COUNSEL**

**ARGUED:** Stephen Patrick Demm, HUNTON & WILLIAMS, LLP, Richmond, Virginia, for Appellant/Cross-Appellee. Albert P. Allan, ALLAN LAW FIRM, PLLC, Charlotte, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Thomas G. Slater, Jr., John Gary Maynard, III, George P. Sibley, III, HUNTON & WILLIAMS, LLP, Richmond, Virginia; Mark G. Arnold, HUSCH BLACKWELL SANDERS LLP, St. Louis, Missouri, for Appellant/Cross-Appellee. Stephen L. Curry, North Little Rock, Arkansas; Michael P. Thomas, PATRICK HARPER & DIXON, LLP, Hickory, North Carolina, for Appellee/Cross-Appellant.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

Georgia-Pacific Consumer Products, LP (G-P), successor-in-interest to Georgia Pacific Corporation, is a leading designer/manufacturer of, <u>inter alia</u>, paper products and dispensers for such products for the home and the away-from-home setting (<u>e.g.</u>, hotels, stadiums, restaurants, etc). This case implicates two related products first introduced by G-P in October 2002--the *enMotion*® touchless paper towel dispenser (*enMotion*® Dispenser) and paper toweling with a high-quality, fabric-like feel designed specifically for use in and problem-free operation of *enMotion*® Dispensers (*enMotion*® Toweling). Although G-P actually sells *enMotion*® Toweling to janitorial supply distributors, who, in turn sell it to their respective end-user customers (<u>e.g.</u>, hotels, stadiums, restaurants, etc.), G-P only leases

*enMotion* ® Dispensers to such distributors, who, in turn, are permitted to sublease them to their respective end-user customers. The leases and subleases expressly provide that only *enMotion* ® Toweling can be used in *enMotion* ® Dispensers and stickers on the inside of *enMotion* ® Dispensers reinforce the limitation.

The face of every *enMotion* ® Dispenser bears four registered trademarks owned by G-P-- *enMotion* ®, **Georgia-Pacific** ®, *GP* ®, and ® or ®. Collectively, we refer to the first three of these trademarks as "the G-P Marks," which are the three trademarks at issue on appeal.

On July 8, 2005, after one of G-P's competitors, von Drehle Corporation (VD), started marketing and selling to distributors an inferior paper toweling specifically manufactured by VD for use in *enMotion* ® Dispensers, G-P brought the present civil action against VD, alleging the following four causes of action at issue on appeal:  (1) unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) contributory trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114(1); (3) unfair competition in violation of North Carolina common law; and (4) tortious interference with contractual relationships in violation of North Carolina common law.[1]  VD counterclaimed for violation of the North Carolina Unfair and Deceptive Trade Practices Act (NC UDTPA), N.C. Gen. Stat. § 75.1.1.  Ultimately, on cross-motions for summary judgment with respect to all of G-P's claims, the district court granted summary judgment in favor of VD.  The district court also granted summary judgment in favor of G-P with respect to VD's counterclaim.

---

[1] G-P also initially named Carolina Janitorial & Maintenance Supply, Inc. as a defendant.  Carolina Janitorial & Maintenance Supply, Inc. has since been dismissed from the case and is not a party on appeal.

G-P now appeals the district court's summary judgment ruling with respect to its four claims set forth above, and VD cross-appeals the district court's summary judgment ruling with respect to its single counterclaim. For reasons that follow, we vacate the district court's grant of summary judgment in favor of VD with respect to G-P's claims for contributory trademark infringement and unfair competition under the Lanham Act, unfair competition under North Carolina common law, and tortious interference with contract under North Carolina common law, and remand for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment in favor of G-P with respect to VD's counterclaim under the NC UDTPA.

I.

In analyzing de novo whether the district court erred in granting summary judgment in favor of VD, we view the facts and draw all reasonable inferences therefrom in the light most favorable to G-P, as the nonmoving party. Garofolo v. Donald B. Heslep Assocs., Inc., 405 F.3d 194, 198 (4th Cir. 2005). G-P's claims are based upon the following facts.

For many years, G-P has designed, manufactured, and sold what those in the paper towel dispenser industry call "universal dispensers." Other companies, including VD, also design, manufacture, and sell universal dispensers. Universal dispensers accept and are intended to accept paper toweling from multiple manufacturers. However, with the introduction of **enMotion** ® Dispensers, G-P sought to introduce a non-universal dispenser tied directly to the G-P Marks--i.e., one that G-P intended would only operate with, and one in which the restroom visitor would expect to dispense, **enMotion** ® Toweling. In this way, G-P sought to create a branded-dispenser situation akin to a branded Coca-Cola® soda fountain dispenser, which the user expects to dispense only genuine Coca-Cola® products.

Turning to the specifics of **enMotion** ® Dispensers, they dispense a pre-measured amount of paper toweling upon activation

of an electronic motion sensor, without the user having to touch the dispenser in any manner, thus providing a hygienic experience superior to that of a manual paper towel dispenser otherwise requiring the user to touch the dispenser. At the time of their introduction in October 2002, **enMotion**® Dispensers were the only electronic, hands-free, paper towel dispensers available in the marketplace.

G-P invented the high-end **enMotion**® Dispenser with the intent that it would operate with only non-standard, ten-inch **enMotion**® Toweling, which toweling has a soft-fabric like feel created by using a through-air-dried (TAD) process. Although the packaging of **enMotion**® Toweling bears the G-P marks, **enMotion**® Toweling itself bears no source identifying marks. To reinforce G-P's desire to create a branded dispenser situation akin to the Coca-Cola® soda fountain dispenser, every **enMotion**® Dispenser bears a sticker-notice inside of it stating that such dispenser "is the property of Georgia-Pacific" and "may be used only to dispense the trademark-bearing products identified on its exterior." (J.A. 36). Although G-P uses its **enMotion**® mark only with **enMotion**® Dispensers,[2] it uses the marks **Georgia-Pacific**® and **GP**® on many of its other products, such as Brawny® paper towels and Quilted Northern® toilet paper. Notably, VD does not dispute that **enMotion**® Dispensers have been an extremely successful product for G-P and that many commercial facilities in the United States have installed **enMotion**® Dispensers.

G-P leases **enMotion**® Dispensers to distributors via a pre-printed lease agreement furnished by G-P. Such lease agreement

---

[2] In addition to **enMotion**® Dispensers, G-P also manufactures a touchless **enMotion**® foam soap dispenser.

grants a distributor permission to sublease *enMotion* ® Dispensers "to the end-user customers that shall be approved by G-P . . . ." (J.A. 1086). A typical example of this supply chain is when G-P leases *enMotion* ® Dispensers to a distributor, who in turn subleases them to a hotel operator for use in the hotel's public restrooms. Notably, although G-P argues that it is a party to the subleases between distributors and the end-user customers (i.e., the sublessees), the record does not support such a finding.

Also to reinforce its desire to create a branded dispenser situation akin to the Coca-Cola® soda fountain dispenser, the lease agreements between G-P and its distributors provided that *enMotion* ® Dispensers would remain the property of G-P and that "only G-P branded towels . . . shall be used in" *enMotion* ® Dispensers -- the "[u]se of other unauthorized product(s) is strictly prohibited." Id. Moreover, the lease agreements provided, in relevant part:

> Use of Dispensers by Others
>
> 2.1     Distributor shall sublease the Dispensers to the end-user customers that shall be approved by G-P and set forth in Exhibit "A" attached hereto ("Customers"). All subleases of Dispensers to Customers shall be solely upon the terms and conditions of this Agreement and of the Sublease Registration Form ("Sub Form") which is attached hereto as Addendum 1.
>
> 2.2     The Sub Form must be fully executed by Distributor for each Customer location in which Dispensers are to be installed. Execution of the Sub Form does not transfer ownership of the Dispensers by G-P to Distributor or Customer.

Id.

VD is a corporation organized under the laws of North Carolina, with its principal place of business in Hickory, North Carolina. Like G-P, VD manufactures paper towel products for the away-from-home market. With one exception not relevant to this appeal, VD sells its products throughout the continental United States to janitorial supply distributors who, in turn, sell to end-user customers such as hotels and restaurants. Notably, although VD actually sells its products to distributors, it directly markets its products to end-user customers via its sales personnel either by themselves or in conjunction with the sales personnel of distributors making in-person sales calls on such customers to encourage them to purchase VD products from the distributors. Brothers Raymond von Drehle and Steven von Drehle, who each hold a fifty-percent stake in VD, run the company, with Raymond serving as VD's chairman and Steven as its president.

By 2004, VD knew about and its sales personnel had inspected *enMotion* ® Dispensers. Then, in July 2004, VD specifically developed a ten-inch toweling for use in *enMotion* ® Dispensers (VD's 810-B Toweling). Notably, VD's 810-B Toweling is of a lower quality than *enMotion* ® Toweling, with a slick, scratchy feel. In a July 23, 2004 e-mail, VD Chairman Raymond von Drehle told all five members of VD's industrial sales team that each would "be receiving two rolls of the ten-inch hardwound which will fit the GP enMotion dispenser" and directed them to "[g]ive us some feedback from your customers ASAP." (J.A. 1706) (internal quotation marks omitted). In his deposition in this case, Chairman Raymond von Drehle testified that inherent in his direction was that his sales staff "go show [the sample 810-B Toweling] to distributors, customers, and have them use it in the enMotion dispenser . . .," in order to get their feedback. (J.A. 1721). He also testified that if he did receive feedback, he could not remember what it was, but that he assumed that it was positive, because he would have remembered negative feedback.

In August 2004, with its newly developed 810-B Toweling on-line, VD embarked on a sales campaign, through its sales personnel, to put its 810-B Toweling in the hands of distributors for

resale to end-user customers to "stuff" in enMotion® Dispensers.[3]  The record leaves no doubt on this point.  First, at the time VD developed and began selling its 810-B Toweling, enMotion® Dispensers were the only paper towel dispensers on the market which could accept a ten-inch wide toweling.  Second, VD's Chairman Raymond von Drehle and VD Sales Manager for Virginia and North Carolina Duke Thomas, as well as some of VD's other sales staff, on occasion even referred to VD's 810-B Toweling as "the enMotion towel."  (J.A. 1338, 1965, 1712).  Third, VD's President Steven von Drehle testified in his deposition on August 7, 2006, that VD "intends for the 810-B [towel] to be stuffed in the enMotion dispensers," (J.A. 1399), and that "every roll of the 810-B towel that [has been] sold to date, . . . [is] going to be used in an enMotion dispenser," (J.A. 1368).  Fourth, VD's Chairman Raymond von Drehle testified in his deposition on August 8, 2006, that VD's "sales force, at least orally, has promoted the use of the 810-B towel for use in GP's enMotion dispenser . . .," and that VD designed and intended for the 810-B Toweling to be stuffed in G-P's enMotion® Dispensers.  (J.A. 1732).  Since VD began selling its 810-B Toweling in August 2004, its sales of such steadily increased, because its lower quality allowed VD to sell it for a lower price than enMotion® Toweling.  Some of VD's sales personnel, however, did receive negative comments from some distributors about the lower quality of VD's 810-B Toweling as compared to enMotion® Toweling.

In early January 2005, after learning of VD's stuffing campaign, G-P sent VD a cease and desist letter, informing it that its conduct constituted trademark infringement and tortious interference with contractual relations.  In a response letter dated March 7, 2005, VD defended its conduct regarding its 810-B Toweling as legitimate competition and denied that such conduct infringed Georgia-

---

[3] Both VD and G-P describe the loading of enMotion® Dispensers with VD's 810-B Toweling as "stuffing."

Pacific's intellectual property rights or interfered with its contractual rights.

G-P argued below and continues to argue on appeal that VD, by inducing and facilitating the stuffing of **enMotion**® Dispensers with VD's 810-B Toweling, created post-purchase confusion as to the source of such toweling among restroom visitors, thus creating the potential to harm its reputation and goodwill. On this issue, the record contains the results of three empirical studies from which a reasonable jury could find that stuffing VD's 810-B Toweling in **enMotion**® Dispensers created a significant amount of consumer confusion as to the source of the paper toweling being dispensed.

In the first study, a national survey conducted in 2005 by G-P's expert witness, Dr. Eli Seggev,[4] 70% of the study participants expected there to be an association of various degrees between the source of **enMotion**® Dispensers and the source of the toweling being dispensed, and 45% expected such toweling to be the same brand as the dispenser. In the second study, conducted in 2006 by Dr. Seggev, 74% of consumers expected there to be an association of various degrees between the source of **enMotion**® Dispensers and the source of the toweling being dispensed, and 47% expected the toweling in **enMotion**® Dispensers to be the same brand as the dispenser. In the third study, conducted in September 2006 by VD's expert witness Kenneth Hollander, 47.9% believed that the paper towel dispenser and the paper toweling being dispensed would originate from the same source.

G-P appeals the district court's grant of summary judgment in favor of VD with respect to its contributory trademark infringement and unfair competition claims under the Lanham Act, its unfair competition claim under North Carolina common law, and

---

[4] Dr. Seggev has a Ph.D. in Marketing and Quantitative Methods from Syracuse University.

its tortious interference with contractual relationships claim under North Carolina common law.  VD cross-appeals the district court's grant of summary judgment in favor of G-P with respect to its counterclaim alleging violation of the NC UDTPA.

## II.

G-P's contributory trademark infringement and unfair competition claims under the Lanham Act and its unfair competition claim under North Carolina common law are all based upon the same intentional conduct by VD--i.e., VD's express marketing of its 810-B Toweling to distributors and end-user customers and its selling of such toweling to distributors all for the purpose of end-user customers stuffing 810-B Toweling in *enMotion* ® Dispensers, thus creating post-purchase confusion as to the source of toweling dispensed from *enMotion* ® Dispensers among restroom visitors. Notably, the parties do not dispute that, under the facts of this case, viewed in the light most favorable to G-P, the tests for trademark infringement and unfair competition under the Lanham Act are essentially the same as that for common law unfair competition under North Carolina common law; all focus on the likelihood of confusion as to the source of the goods involved.  See People for the Ethical Treatment of Animals v. Doughney (PETA), 263 F.3d 359, 364 (4th Cir. 2001) (listing same elements for trademark infringement and unfair competition under the Lanham Act and Virginia common law of unfair competition); AMP, Inc. v. Foy, 540 F.2d 1181, 1188 (4th Cir. 1976) ("North Carolina law of unfair competition is not dissimilar to the federal law of trademark infringement . . . ."); Charcoal Steak House of Charlotte, Inc. v. Staley, 139 S.E.2d 185, 189 (N.C. 1964) (under North Carolina common law, unfair competition is the child of confusion). Moreover, because VD did not itself physically stuff its 810-B Toweling in *enMotion* ® Dispensers, G-P's claims under the Lanham Act and its unfair competition claim under North Carolina common law must be analyzed under the judicially created doctrine of contributory trademark infringement, derived from the common law of torts.  See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54 (1982); William R. Warner & Co. v. Eli Lilly & Co.,

265 U.S. 526, 530-31 (1924); Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 103-04 (2d Cir. 2010). Accordingly, we analyze the three claims simultaneously. All rise or fall, for purposes of this appeal, upon whether G-P has proffered sufficient evidence for a reasonable jury to find that VD is liable for contributory trademark infringement.

Our first stop on our journey to resolve this question is the Supreme Court's decision in Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 853-54 (1982). In Inwood, the plaintiff, a name brand drug manufacturer, sued three generic drug manufacturers for trademark infringement under § 32 of the Lanham Act, after some pharmacists indisputably mislabeled the generic drug cyclandelate, manufactured by the defendants, as plaintiff's trademarked version CYCLOSPASMOL. Id. at 849. Although the plaintiff did not allege that the generic manufacturers had actually applied the trademark CYCLOSPASMOL to their respective generic versions, the plaintiff did allege the defendants had "induced pharmacists illegally to substitute a generic drug for CYCLOSPASMOL and to mislabel the substitute drug CYCLOSPASMOL," by marketing their CYCLOSPASMOL look-a-like generic versions to wholesalers, hospitals, and retail pharmacies via "catalog entries comparing prices and revealing the colors of the generic capsules . . . ." Id. at 850.

After a bench trial, the district court found the generic manufacturers were not liable for trademark infringement under § 32 of the Lanham Act. Inwood, 456 U.S. at 852.

In reaching that conclusion, the court first looked for direct evidence that the [generic manufacturers] intentionally induced trademark infringement. Since the [generic manufacturers'] representatives do not make personal visits to physicians and pharmacists, the[y] were not in a position directly to suggest improper drug substitutions. Therefore, the court concluded, improper suggestions, if any, must have come from catalogs and promotional materials. The court

determined, however, that those materials could not "fairly be read" to suggest trademark infringement.

The trial court next considered evidence of actual instances of mislabeling by pharmacists, since frequent improper substitutions of a generic drug for CYCLOSPASMOL could provide circumstantial evidence that the petitioners, merely by making available imitative drugs in conjunction with comparative price advertising, implicitly had suggested that pharmacists substitute improperly. After reviewing the evidence of incidents of mislabeling, the District Court concluded that such incidents occurred too infrequently to justify the inference that the [generic manufacturers'] catalogs and use of imitative colors had "impliedly invited" druggists to mislabel. Moreover, to the extent

> mislabeling had occurred, the court found it resulted from pharmacists' misunderstanding of the requirements of the New York Drug Substitution Law, rather than from deliberate attempts to pass off generic cyclandelate as CYCLOSPASMOL.

Id. at 852-53 (internal citations omitted). On appeal, the Second Circuit, without expressly stating that the district court's findings were clearly erroneous, and for reasons not relevant to the issues in the present appeal, concluded that the generic manufacturers had violated § 32 of the Lanham Act. Inwood, 456 U.S. at 853.

The Supreme Court then granted certiorari "to consider the circumstances under which a manufacturer of a generic drug, designed to duplicate the appearance of a similar drug marketed by a competitor under a registered trademark, can be held vicariously liable for infringement of that trademark by pharmacists who dispense the generic drug." Id. at 846. In resolving this issue, the Court held:

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of

distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.

Id. at 853-54.[5]

In a subsequent case, the Court characterized its ultimate holding in Inwood as observing "that a manufacturer or distributor could be held liable to the owner of a trademark if it intentionally induced a merchant down the chain of distribution to pass off its product as that of the trademark owner's or if it continued to supply a product which could readily be passed off to a particular merchant whom it knew was mislabeling the product with the trademark owner's mark." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 439 n.19 (1984).

The next step in our analytical journey is to apply the teachings of Inwood to the facts of the present case. Assuming arguendo that the stuffing of *enMotion* ® Dispensers with VD's 810-B Toweling by end-user customers constitutes trademark infringement under the Lanham Act, the record contains sufficient evidence for a reasonable jury to find, under the test for contributory infringement announced in Inwood, that VD is liable for contributory trademark infringement. More specifically, assuming

---

[5] Ultimately, the Supreme Court reversed the Second Circuit on the basis that the district court's factual findings that the generic manufacturers had not intentionally induced the pharmacists to mislabel generic drugs nor had continued to supply cyclandelate to pharmacists whom the generic manufacturers knew were mislabeling generic drugs were not clearly erroneous. Id. at 855.

*arguendo* that the stuffing of **enMotion**® Dispensers with VD's 810-B Toweling constitutes trademark infringement, the record contains sufficient evidence for a reasonable jury to find that VD directly induced such infringement and continued to supply its product to distributors knowing that such infringement was taking place. VD candidly admits that it developed its 810-B Toweling for the specific purpose of end-user customers stuffing **enMotion**® Dispensers, which dispensers were the only ones on the market at the time to accept ten-inch wide toweling. Moreover, the record supports a finding that VD's sales personnel made in-person sales calls on distributors and end-user customers to market VD's 810-B Toweling as a less expensive alternative to **enMotion**® Toweling. And, leaving no doubt as to VD's intentions, VD President Steven von Drehle testified in his deposition, a year and a half after G-P had sent its cease and desist letter to VD, that VD "intends for the 810-B [towel] to be stuffed in the enMotion dispensers," (J.A. 1399), and that "every roll of the 810-B towel that [has been] sold to date . . . [is] going to be used in an enMotion dispenser." (J.A. 1368).

Because VD cannot be liable for contributory trademark infringement without corresponding direct trademark infringement, Inwood, 456 U.S. at 853-54, the next stop on our analytical journey requires us to decide whether the record contains sufficient evidence for a reasonable jury to find, by a preponderance of the evidence, that the stuffing of **enMotion**® Dispensers with VD's 810-B Toweling by end-user customers constitutes trademark infringement under the Lanham Act. We would decide this question in the affirmative, if this record contains sufficient evidence from which a reasonable jury could find, by a preponderance of the evidence, that: (1) G-P possesses one or more trademarks; (2) end-user customers used one or more of such trademarks; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of goods, and (5) in a manner likely to cause confusion in the relevant public. 15 U.S.C. §§ 1114(1), 1125(a); PETA, 263 F.3d at 364; Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125 n.3 (4th Cir. 1990); AMP, Inc. v. Foy, 540 F.2d 1181, 1188 (4th Cir. 1976) ("North Carolina law of unfair competition is not dissimilar to the

federal law of trademark infringement . . . ."); Yellowbrix, Inc. v. Yellowbrick Solutions, Inc., 181 F. Supp. 2d 575, 583 (E.D.N.C. 2001) ("The North Carolina common law of unfair competition in the context of trademarks and tradenames is similar to the federal law of trademark infringement.").

The first element of this test is met on the present record. Under the Lanham Act, a trademark includes any word, name, symbol, or device used by an individual to identify and distinguish his goods "from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  As we recently explained:

> A trademark puts the purchasing public on notice that all goods bearing the trademark: (1) originated from the same source; and (2) are of equal quality.  Thus, a trademark not only protects the goodwill represented by particular marks, but also allows consumers readily to recognize products and their source, preventing consumer confusion between products and between sources of products.

George & Co., LLC v. Imagination Entertainment Ltd., 575 F.3d 383, 392-93 (4th Cir. 2009) (internal quotation marks and citations omitted).  Given that G-P has registered the G-P marks with the United States Patent and Trademark Office, from the summary judgment record, a reasonable jury could find, by a preponderance of the evidence, that the G-P marks displayed on the *enMotion* ® Dispensers are valid and protectable trademarks.  See Brittingham v. Jenkins, 914 F.2d 447, 452 (4th Cir. 1990) (under 15 U.S.C. § 1057(b), "a certificate of registration of a mark serves as prima facie evidence that the registrant owns the registered mark, has properly registered it under the Lanham Act, and is entitled to its exclusive use in commerce"; thus, under 15 U.S.C. § 1115(a), "registration creates a presumption of the registrant's ownership of the mark, subject to any applicable legal or equitable defenses or defects").

The second, third, and fourth elements are also met on the present record. By stuffing *enMotion*® Dispensers with VD's 810-B Toweling, end-user customers used one or more of the G-P Marks in commerce in connection with the distribution of goods, i.e., the distribution of VD's 810-B Toweling. This situation is no different from a hotel placing a Coca-Cola® brand fountain dispenser in its lobby for the complimentary consumption of its patrons, while surreptitiously stocking it with generic cola. There is no question that, in such a case, the hotel is using the Coca-Cola® trademark to service its customers (i.e., in commerce) by distributing generic cola in a Coca-Cola® brand fountain dispenser.

This brings us to the fifth element, which was the centerpiece of the parties' legal battling below. The fifth element focuses upon whether the alleged infringer used the plaintiff's trademark in a manner likely to cause confusion in the relevant public. Just who is the relevant public (or relevant audience to put it differently) is the most hotly debated issue on appeal. Below, the district court held that VD was entitled to summary judgment in its favor with respect to G-P's contributory trademark infringement and unfair competition claims under the Lanham Act and its unfair competition claim under North Carolina common law on the basis that no evidence existed that VD's marketing and selling of its 810-B Toweling for stuffing in *enMotion*® Dispensers caused confusion for the distributors or the end-user customers. In so holding, the district court rejected G-P's legal theory that restroom visitors who consume toweling from *enMotion*® Dispensers in hotels, stadiums, and restaurants, etc., constitute the relevant audience for purposes of the required likelihood-of-confusion analysis. On appeal, VD defends the district court's reasoning, while G-P contends that it is at odds with well-established Fourth Circuit precedent recognizing that post-purchase confusion can be actionable under the Lanham Act.

We agree with G-P that the district court erred in limiting its likelihood of confusion inquiry to distributors who purchased 810-B Toweling and their respective end-user customers. While transitory public confusion will not satisfy the likelihood of confusion element, Fourth Circuit case law makes room for the factfinder to consider

confusion among the non-purchasing public in the likelihood-of-confusion inquiry if it can "be shown that public confusion will adversely affect the plaintiff's ability to control his reputation among its laborers, lenders, investors, or other group with whom plaintiff interacts." Perini Corp., 915 F.2d at 128.

For example, in Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145 (4th Cir. 1987), the trademark owner demonstrated likelihood of confusion, including post-sale confusion, between its trademarked products and counterfeit shirts manufactured by the defendant, because anyone seeing the counterfeit shirt bearing plaintiff's trademarked logo being worn by its owner would not see the defendant's label on the inside back of the neck, but would only see plaintiff's trademarked logo on the front of the shirt. Id. at 148. Thus, it was likely that the observer would identify the shirt with the plaintiff, and the plaintiff's reputation would suffer damage if the shirt appeared to be of poor quality. Id. See also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 17 (1st Cir. 2004) (citing Perini in support of holding that likelihood of confusion inquiry in trademark case is not limited to actual or potential purchasers, but also includes others whose confusion threatens trademark owner's commercial interest in its mark); AMP Inc., 540 F.2d at 1183, 1188 (4th Cir. 1976) (in limiting its likelihood-of-confusion inquiry to whether or not plaintiff's customers were likely to be confused by defendant's use of the word AMP, district court used too narrow a test for determining likelihood of confusion; inquiry should have additionally focused on likelihood of danger that such use would confuse public in general; remanded for reconsideration); Restatement (Third) of Unfair Competition § 20 cmt. b (1995) ("To be actionable . . . confusion must threaten the commercial interests of the owner of the mark, but it is not limited to the confusion of persons doing business directly with the actor."); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:7 (4th ed. 2009) ("In 1962, Congress struck out language in the Lanham Act which required confusion, mistake or deception of 'purchasers as to the source of origin of such goods and services.' Several courts have noted this expansion of the test of infringement and held that it supports a finding of infringement when even non-

purchasers are deceived.") (footnote omitted). Cf. Lyons Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 802-03 (4th Cir. 2001) (relevant inquiry in determining whether costume rented by costume rental company was intrinsically similar in design to popular children's television character (i.e., Barney) that was protected by copyright, as would support finding of copyright infringement based on substantial similarity, was whether costume and copyrighted character expressed ideas in substantially similar manner from perspective of intended audience of young children, rather than from perspective of adults, even though costume was purchased by adults).

Having decided the district court erred in limiting its likelihood of confusion inquiry to distributors who purchased 810-B Toweling and their respective end-user customers, we are confronted with two sequential questions. First, we must ask whether G-P has proffered sufficient evidence for a reasonable jury to find likelihood of confusion among restroom visitors as to the source of the paper toweling being dispensed from *enMotion* ® Dispensers when such dispensers are stuffed with 810-B Toweling. If the answer to this question is yes, we must then ask whether G-P has proffered sufficient evidence for a reasonable jury to find that the likelihood of confusion among such restroom visitors will adversely affect G-P's reputation among its laborers, lenders, investors, or other group with whom G-P interacts. See Beacon Mut. Ins. Co., 376 F.3d at 15 ("[t]he fact that the injury is to a company's reputation or goodwill, rather than` directly to its sales, does not render the confusion any less actionable."); Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 693 (6th Cir. 2000) (damages may be awarded for actual confusion that causes harm to goodwill under Lanham Act even if no lost sales have been shown); Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1091 (7th Cir. 1988) ("the owner of a mark is damaged by a later use of a similar mark which place[s] the owner's reputation beyond its control, though no loss in business is shown" (emphasis and alteration in original) (internal quotation marks omitted)).

In answering the first question, we look at nine factors, some of which may be irrelevant under the circumstances of the present case: "(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public." George & Co., LLC, 575 F.3d at 393. Because the nature of the trademark infringement claim at issue is stuffing a branded dispenser with a generic product, some of these factors are either entirely irrelevant or only slightly relevant. For example, the similarity of the two marks (i.e., competing marks) to consumers is irrelevant, because VD's 810-B Toweling bore no trademarks. Suffice it to say, for purposes of surviving VD's motion for summary judgment, we conclude that G-P has forecast sufficient evidence for a reasonable jury to find a likelihood of confusion among restroom visitors as to the source of the paper toweling being dispensed from *enMotion* ® Dispensers when such dispensers are stuffed with 810-B Toweling. The record contains sufficient evidence for a reasonable jury to find that G-P's marks are strong, they appear on the front of *enMotion* ® Dispensers, and VD's 810-B Toweling is inferior to *enMotion* ® Toweling, but nonetheless was intentionally made to fit and operate in *enMotion* ® Dispensers. Moreover, the record contains the results of three empirical studies from which a reasonable jury could find that stuffing VD's 810-B Toweling in *enMotion* ® Dispensers creates a significant amount of actual consumer confusion as to the source of the paper toweling being dispensed. See, supra, Part I. For example, in the first study, a national survey conducted in 2005 by G-P's expert witness, 70% of the study participants expected there to be an association of various degrees between the source of *enMotion* ® Dispensers and the source of the toweling being dispensed, with 45% expecting such toweling to be the same brand as the dispenser. The other two studies were similarly probative, with the study conducted in September 2006 by

VD's expert witness Kenneth Hollander showing that 47.9% of those surveyed believed that the paper towel dispenser and the paper toweling being dispensed would originate from the same source. Thus, as to the first sequential question we previously set forth, G-P has proffered sufficient evidence for a reasonable jury to find likelihood of confusion among restroom visitors as to the source of the paper toweling being dispensed from *enMotion* ® Dispensers, when such dispensers are stuffed with 810-B Toweling.

With respect to the second sequential question--i.e., whether G-P has proffered sufficient evidence for a reasonable jury to find that the likelihood of confusion among such restroom visitors will adversely affect G-P's reputation among its laborers, lenders, investors, or other groups with whom G-P interacts--we hold in the affirmative. First, without the ability to control the quality of the toweling used in *enMotion* ® Dispensers, G-P is subject to the risk of injury to the reputation of the G-P Marks. See Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 243 (2d Cir. 2009) ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark."); Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991) ("[T]he actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain."). Second, although proof that VD's 810-B Toweling is inferior to *enMotion* ® Toweling is unnecessary in order to establish that confusion among restroom visitors who use *enMotion* ® Toweling stuffed with VD's 810-B Toweling will adversely affect G-P's reputation among its laborers, lenders, investors, or other groups with whom G-P interacts, the record shows that VD actually received complaints from at least the distributor level about the inferior quality of its 810-B Toweling as compared to *enMotion* ® Toweling. Third, the record shows that the TAD process used in manufacturing *enMotion* ® Toweling gives it a

fabric-like feel superior to VD's 810-B Toweling. And fourth, in his deposition testimony, VD Chairman Raymond von Drehle conceded that if **enMotion** ® Dispensers were stuffed with a poor quality paper towel or resulted in poor operation of such dispenser, such a situation would likely affect how an end-user, and by reasonable inference, a restroom visitor, would evaluate G-P's hands-free product.

Because G-P has proffered sufficient evidence, viewed in the light most favorable to G-P, for a reasonable jury to find, by a preponderance of the evidence, in favor of G-P with respect to each element of G-P's contributory trademark infringement and unfair competition claims under the Lanham Act and its unfair competition claim under North Carolina common law, we vacate the district court's grant of summary judgment in favor of VD with respect to those claims and remand for further proceedings consistent with this opinion.[6]

## III.

G-P next challenges the district court's grant of summary judgment in favor of VD with respect to its North Carolina common law claim for tortious interference with contract.[7] G-P premises this

---

[6] We note that G-P makes a highly unusual request that we order the district court to enter judgment in its favor on these claims without remanding for further proceedings. This we cannot do, given that, at a minimum, summary judgment is inappropriate because there are genuine issues of material fact.

[7] G-P also briefly mentions that it is challenging the district court's grant of summary judgment with respect to its North Carolina common law claim for tortious interference with prospective contractual relations (a.k.a. tortious interference with prospective advantage). We need not address this claim on the merits, however, because G-P failed to present any argument on the claim, which has different elements than a tortious interference with

claim upon VD's alleged interference with the enMotion ® leases and subleases.   To overcome VD's motion for summary judgment with respect to this claim, G-P had to proffer evidence sufficient for a reasonable jury to find, by a preponderance of the evidence, that (1) G-P had a valid contract with a third party that gave it contractual rights; (2) VD knew of the contract; (3) VD intentionally induced the third party not to perform the contract; (4) VD acted without justification; and (5) G-P was thereby damaged. Embree Const. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992).   Under North Carolina law, whether a defendant's conduct is justified depends upon the circumstances surrounding the interference, the defendant's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the defendant, and the contractual interests of the other party. Id. "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." Id. "Numerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 650 (N.C. 1988).

Of particular relevance to the present appeal, the Supreme Court of North Carolina has elaborated on when a defendant's interference is not justified:

> There are frequent expressions in judicial opinions to the effect that malice is requisite to liability in an action for inducing a breach of contract. It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case for the recovery

---

contract claim.   S.N.R. Mgt. Corp. v. Danube Partners 141, LLC, 659 S.E.2d 442, 452 (N.C. Ct. App. 2008).

of compensatory damages against the outsider for tortiously inducing the breach of the third person's contract with the plaintiff. The term "malice" is used in this connection in its legal sense, and denotes the intentional doing of the harmful act without legal justification. . . . A malicious motive makes a bad act worse, but it cannot make that wrong which, in its own essence, is lawful.

Childress v. Abeles, 84 S.E.2d 176, 182 (N.C. 1954) (internal quotation marks omitted).

The district court granted summary judgment in favor of VD with respect to G-P's tortious interference with contract claim on the basis that VD's interference was justified as legitimate competition. We vacate the district court's judgment with respect to this claim and remand for further proceedings with limiting instructions. First, because the record cannot support a finding that G-P had contractual relationships with the end-user customers,[8] this claim is limited to whether VD tortiously interfered with G-P's contractual relationships with distributors.[9] Second, G-P can only prevail on this claim at trial if it first prevails upon any one of its other remanded claims. Such unlawful conduct on the part of VD would vitiate VD's claim to justifiable interference with the *enMotion* ® Dispenser leases between G-P and distributors by legitimate competition. See Restatement (Second) of Torts § 767 cmt. c. (in evaluating nature of defendant's conduct for purposes of tortious interference with contract claim, one consideration is whether defendant's conduct is unlawful; "Conduct specifically in violation of statutory provisions or contrary to established public policy may

---

[8] G-P was not a party to the subleases between distributors and end-users.

[9] G-P was a party to the leases between it and distributors.

for that reason make an interference improper.").  In sum, this claim goes back under the limitations we have set forth.

IV.

On cross-appeal, VD challenges the district court's grant of summary judgment in favor of G-P with respect to its claim under the NC UDTPA.[10]  According to VD, G-P violated the NC UDTPA by attempting to enforce provisions in the **enMotion** ® Dispenser leases and subleases requiring that only **enMotion** ® Toweling be used in **enMotion** ® Dispensers.  VD's challenge is without merit.

In order to prevail upon its claim under the NC UDTPA, VD must prove the following, by a preponderance of the evidence:  (1) an unfair or deceptive act or practice or an unfair method of competition by G-P, (2) in or affecting commerce, (3) which proximately caused actual injury to VD.  Walker v. Fleetwood Homes of NC, Inc., 653 S.E.2d 393, 399 (N.C. 2007).  In granting summary judgment in favor of G-P on this claim, the district court reasoned:

> Without speaking to whether such leases are enforceable, the Court finds no facts that demonstrate that GP's attempt to enforce such leases constituted an unfair or deceptive practice.  The facts demonstrate that GP drafted and entered into lease and sublease agreements with distributors and end-users in good faith, openly, and transparently.  In addition, von Drehle has failed to demonstrate an actual injury stemming from the alleged unfair or deceptive trade practice.  The facts demonstrate that von Drehle has competed favorably with GP in the sale of paper

---

[10] In analyzing this claim, we view the evidence in the light most favorable to VD as the nonmoving party.

towels for the enMotion® dispenser, despite GP's attempt to enforce the lease and sublease agreements. GP is entitled to summary judgment in its favor on von Drehle's Unfair and Deceptive Trade Practices Act claim.

(J.A. 455).

Other than the district court's statement that G-P entered into sublease agreements with end-users, the district court is right on the money with respect to its analysis of this claim. On appeal, VD has pointed to nothing in the record, nor cited any case law, establishing that the district court erred in granting summary judgment in favor of G-P with respect to VD's claim for violation of the NC UDTPA. Accordingly, we affirm the district court with respect to this claim.

V.

In sum, we vacate the district court's grant of summary judgment in favor of VD with respect to G-P's claims for (1) contributory trademark infringement and unfair competition under the Lanham Act, (2) unfair competition under North Carolina common law, and (3) tortious interference with contract under North Carolina common law, and remand for further proceedings consistent with this opinion. With respect to VD's cross-appeal, we affirm the district court's grant of summary judgment in favor of G-P with respect to VD's claim alleging G-P violated the NC UDTPA.

*VACATED AND REMANDED IN PART*
*AND AFFIRMED IN PART*

WILSON, District Judge, concurring specially:

I concur in the decision of the court but write separately to note one matter. In the district court, von Drehle counterclaimed against Georgia-Pacific for violations of § 1 of the Sherman Act, 15 U.S.C. § 1, and § 3 of the Clayton Act, 15 U.S.C. § 14, allegedly carried out through illegal tying arrangements in "the away from home market in the United States for 'hands free' (or 'touchless')

dispensers of hard wound paper towels (the 'tying product'), and the market for hard wound paper towels (the 'tied product') . . . ." (J.A. at 228.)   The district court granted Georgia-Pacific's motion for summary judgment on the Clayton Act claim because "end users [were] purchasing paper towels for the enMotion dispenser from von Drehle," and consequently there was no "evidence of actual coercion by the seller that forced the buyer to accept the tied product." (J.A. at 452-453.)   It granted summary judgment on the Sherman Act claim because "von Drehle has competed favorably with GP in the sale of paper towels for the enMotion dispenser" and could show no injury. (J.A. at 453.)  Of course, should Georgia-Pacific prevail on its Lanham Act or tortious interference claims on remand, the district court's reasoning would retain no vitality.  But von Drehle did not cross-appeal on this issue, and the matter will have to play out (if it is to play out at all) on another day and, perhaps, on a different stage.