**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 11-1124**

_____

TENISHA JIGGETS, on behalf of minor child S.J.,

              Plaintiff – Appellee,

       v.

CHRISTOPHER T. LONG,

              Defendant – Appellant,

       and

FOREVER 21 INCORPORATED; ST. CHARLES TOWN CENTER MALL; JOHN
DOE, an agent of St. Charles Town Center Mall; CHARLES MALL
COMPANY LIMITED PARTNERSHIP,

              Defendants.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Alexander Williams, Jr., District
Judge. (8:08-cv-01473-AW)

_____

Argued:  January 31, 2013           Decided:  February 22, 2013

_____

Before NIEMEYER, GREGORY, and DAVIS, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Davis wrote the opinion,
in which Judge Niemeyer and Judge Gregory joined.

_____

John Francis Breads, Jr., Hanover, Maryland, for Appellant. Donald M. Temple, TEMPLE LAW GROUP, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

In this interlocutory appeal, defendant-appellant Deputy Sheriff Christopher T. Long seeks review of the district court's denial of qualified immunity as to damages claims asserted pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment. Appellee Tenisha Jiggetts brought suit on behalf of her minor child, S.J. ("Jiggetts"), based on Long's forcible arrest of Jiggetts at a shopping mall. The district court held that because genuine disputes of material fact exist as to Jiggetts' claims, Long had not established at an early stage of the case his entitlement to qualified immunity. For the following reasons, we affirm.

I.

In this de novo review of a district court's denial of summary judgment, we view and set forth the material facts in the light most favorable to Jiggetts, the non-movant. See Ga. Pac. Consumer Prods. v. Von Drehle Corp., 618 F.3d 441, 445 (4th Cir. 2010). Then, because of their relevance to the parties' dispute, we set forth the facts as attested to by Long.

A.

Jiggetts and two of her friends went to the St. Charles Towne Center Mall (sometimes hereinafter "the mall") in Waldorf, Maryland, on April 28, 2007. Jiggetts was 14 years old, stood 5-

foot-2, and weighed 100 pounds. She and her friends first went to the Forever 21 store (sometimes hereinafter "the store"), where Jiggetts purchased a navy shirt, for which she received a receipt with a time stamp of 5:44 p.m. Then, after shopping elsewhere in the mall, the group returned to Forever 21, apparently around 7:00 p.m. Jiggetts tried on three pairs of jeans, but did not purchase any of them. After trying on the jeans, she left them on a rack outside the dressing room. Jiggetts continued looking around the store and found a green jacket that she liked. She paid for the jacket and was given a receipt with a time stamp of 7:15 p.m. She and her friends then left the store.

Back in the mall, Jiggetts and her friends were approached by two mall security officers – Dina Rodriguez and Christopher Eusantos – who asked them to return to the store. The security officers advised Jiggetts and her friends they were suspected of shoplifting, which Jiggetts denied. Still, they agreed to return to the store. A store employee asked her to "take off the jeans under your jeans," implying that Jiggetts had stolen jeans by putting them on under her own jeans. J.A. 17. Jiggetts showed that she had no other jeans on by lifting the bottom of her pants leg and pulling down her waistband. The store employee then said, "I'm sorry. You are free to go." J.A. 17, 98.

4

Jiggetts and her friends left the store, but once back in the mall and going up an escalator, Jiggetts noticed that the same two mall security guards were following her. She called her mother from her cell phone to report what was happening. Her mother told her to go outside, where she would pick her up. However, Officer Long, a local deputy sheriff working, in uniform, a part-time security job at the mall, had been alerted by the mall security officers and met Jiggetts at the top of the escalator. While Long conferred with one of the security officers, Jiggetts started walking across the food court, heading for the exits as instructed by her mother. Long caught up with her, asked her to stop, and, when she continued walking, grabbed her arm. Jiggetts managed to free herself – she said she "snatched" her arm away – and continued walking toward the exit. J.A. 106. Long pursued her, caught up with her, and grabbed her arm again, this time with a "tight grip." Id.

Long, still holding Jiggetts' arm, led her through a set of double doors off the food court into a hallway. The two mall security officers were present throughout the encounter. Jiggetts acknowledged that she resisted going to the hallway, stating, "I was trying to pull away, but his grip was too tight." J.A. 117. Jiggetts remained on her phone, first talking with her mother, and then with her father, who asked to speak to Long. Long refused to take the phone to speak to Jiggetts'

5

father, declaring that he would speak to him when he arrived at the mall. Jiggetts continued to "ignor[e]" Long and his requests for her to get off the phone, instead continuing to speak to her father, which angered Long. J.A. 122-23. She explained what happened next as follows:

> So to get the phone, Officer Long and [the male security] officer with the Mohawk grabbed my arm and slammed me against the wall and pinned my arm around my back and take the phone out of my hand and then slam me on the floor, and my face hit the floor, and then handcuffed me.

J.A. 123. Eusantos put his knee on her back, so she was flat on her stomach on the floor, and he and Long handcuffed her. In her deposition, Jiggetts used various verbs to describe how she was taken down to the floor: "slammed," J.A. 124, 126; "pushed," J.A. 126; and "threw," J.A. 127. Jiggetts was "crying" and "hysterical," and her friends were outside the double doors, crying and screaming. J.A. 128. Jiggetts told Long he could look in her purse for the receipts for the two items she had bought from Forever 21; Long did so and found the receipts. Notably, Jiggetts testified that Long did not tell her that she was under arrest until after she had been handcuffed.

Jiggetts' mother and father arrived at the mall and asked what was going on; they directed Long to take the handcuffs off their daughter. She was unhandcuffed, and told her parents that her shoulder was hurting, so they called an ambulance. Jiggetts

6

had a cut under her left eye, and the part of her face that had hit the floor was swollen. The ambulance took her to a hospital, where doctors determined she had a strained ligament, gave her Tylenol, and told her to refrain from physical activity.

The incident had a physical, psychological, and emotional impact on Jiggetts: "After the incident, I didn't want to do a lot of things that I used to like to do." J.A. 142. She stopped playing basketball for a year after the incident. She saw a psychiatrist about 20 times because "I was very angry." J.A. 144.

### B.

Owing to the somewhat tangled procedural course of the proceedings, neither Long nor either of the two security officers, Rodriguez and Eusantos, was ever deposed in the action. Rather, in seeking an early ruling that he was entitled to qualified immunity as a matter of law, Long's version of the incident was put forward in his affidavit, together with certain arrest documents he created shortly after the incident, and selected portions of Jiggetts' deposition.

Long was a member of the Charles County, Maryland, Sheriff's Office; he was working approved secondary employment at the St. Charles Towne Center Mall on April 28, 2007. Shortly after 7:00 p.m. on that date, he received a request for assistance from mall security officers regarding a person who

7

had "become disorderly when approached by employees of the Forever 21 store." J.A. 61-62. He met Security Officer Rodriguez at the top of the escalator in the food court. The officer was walking behind Jiggetts, and Long asked Rodriguez what was going on. Before Rodriguez could respond, however, Jiggetts stated that she had not stolen anything. Long told Jiggetts "that interrupting people was rude" and that "she needed to be quiet while I was speaking with the security officer." J.A. 62. Rodriguez told Long "that Jiggetts had been seen tearing security tags from items of clothing in the store and that the assistant manager did want to press charges." Id.

Jiggetts by this point was walking through the food court, and Long caught up with her and told her to stop. She refused and said she was going outside, as her mother had instructed. Long said he then "used my right hand to take hold of Jiggetts' left arm and told her to come with me, that she was being detained while I investigated further." J.A. 62-63. Long guided Jiggetts to the hallway off the food court for two reasons: (1) to prevent further disturbance in the food court area, and (2) to shield Jiggetts from the embarrassment of having the matter dealt with in a public place. Throughout his efforts to detain Jiggetts, she stayed on her phone with her parents and would not talk to him. He again asked the security officers what happened and they said that "the assistant manager had seen Jiggetts

8

throw security tags on the floor and, prior to that, had heard the tearing sound made when tags are forcibly removed." J.A. 63. Long instructed Jiggetts to hang up her cell phone and that she was under arrest. He apparently obtained possession of her phone, closed it, and told her to put her hands behind her back.

Long described what happened next as follows:

> Instead of complying, Jiggetts pulled her right hand away and swung her left hand at me. I then took hold of Jiggetts' right arm, put it behind her back, and turned her towards the wall which was immediately to her left. I asked Security Officer Rodriguez to handcuff Jiggetts while I kept hold of her right arm. As Officer Rodriguez placed the cuff on Jiggetts' right hand, she pulled to the left and attempted to kick Officer [Eusantos]. I ordered Jiggetts to get on the floor. When she didn't comply, I used an "armbar," a compliance technique taught to [us] in police academies. An armbar extends the elbow joint. It requires effective use of full-body leverage in order to initiate and secure a lock on the targeted elbow, while preventing a suspect from escaping the lock. Armbars generally are a non-dangerous but effective submission technique.

> Through the arm bar, I straightened Jiggetts' right arm and brought her down to her knees, then placed her on the floor by pushing her down on her stomach. Jiggetts continued to struggle until she was fully handcuffed.

J.A. 63-64. Jiggetts was then brought to her feet. A Forever 21 assistant manager, Kelcei McElvine, arrived and showed Long the damaged security tags. She said a customer had alerted her that Jiggetts was removing security tags in the dressing area and that McElvine walked there and heard tags being torn and broken and saw tags landing on the floor of the changing stall.

McElvine said she then saw Jiggetts, who had been in the stall, exit and head to the cashier area, where she paid for "some items, but failed to pay for the damaged items." J.A. 64. McElvine attempted to stop Jiggetts but Jiggetts said she had done nothing wrong and left the store.

Jiggetts did not have any stolen items in her possession at the time of her arrest. She had receipts for the two Forever 21 items she had purchased. Nevertheless, Long charged her with malicious destruction of property, resisting arrest, and theft of property having a value of less than $500 – all misdemeanors. The Department of Juvenile Services decided in due course to drop the charges; it issued Jiggetts a reprimand.

C.

To summarize the conflicting accounts provided by Jiggetts and Long, the gravamen of Jiggetts' version of the event is that as she departed the Forever 21 store, she was suspected by a clerk of shoplifting. At the direction of Rodriguez and Eusantos, the security officers, she returned to the store and was searched. Contrary to the accusation made against her, she had not donned a pair of jeans under her jeans in an attempt to steal them. She satisfied the security officers that she had not secreted merchandise on her person and began to depart the mall. Before she could do so, she was confronted by the same security officers, now accompanied by Long, and the three of them, acting

10

without probable cause to believe she had committed a criminal offense (or indeed, without even reasonable suspicion, because the security officers had satisfied themselves that she had not stolen anything from the store) violently, physically restrained her as she obeyed her parents' instructions to leave the mall and meet them outside, and ultimately arrested her and caused juvenile delinquency proceedings to be instituted against her.

Long's version is that he had probable cause, based on the information provided by the store clerk to the security officers and by them provided directly to Long, to detain Jiggetts long enough to conduct an investigation into what he was being told by the security officers. When Jiggetts refused his command to remain in his presence and to terminate her phone conversation with her parents, he acted reasonably in physically escorting her to the hallway off the food court to conduct his investigation. Thereafter, when Jiggetts "snatched away" her arm and otherwise physically resisted Long and the security officers, Long employed reasonably necessary force to take her to the floor and place her under arrest.

II.

A.

The unusual procedural history of this case merits our attention, as it informs our resolution of this appeal. Fourteen

11

months after the incident in April 2007, on June 6, 2008, Tenisha Jiggetts, on behalf of her minor child, filed a complaint against Forever 21, Inc., St. Charles Towne Center Mall,[1] and two John Doe defendants – one allegedly an agent of Forever 21 and one allegedly an agent of the mall. (The Doe defendants plainly were placeholders for Rodriguez and Eusantos.) The identified defendants were promptly served with process and each promptly filed motions to dismiss. Long was not joined as a defendant in the case until the filing of the First Amended Complaint on October 20, 2008; he was sued in both his individual and official capacities in seven counts: false arrest and excessive force under 42 U.S.C. §§ 1981, 1983, and 1985; racial profiling under 42 U.S.C. §§ 1981 and 1985; false imprisonment; assault and battery; intentional infliction of emotional distress; and a due process violation under the Maryland Constitution.

By the time the district court convened a hearing on the motions to dismiss filed by the store and the mall, on June 19, 2009, no discovery had taken place in the case and indeed, the district court had not issued a scheduling order. Jiggetts had not served Long with process and so she voluntarily dismissed

---

[1] In fact, as counsel later realized, the owner/operator of the mall was defendant Charles Mall Company Limited Partnership, who was later properly named and joined in the action.

all claims against Long, without prejudice, effective June 22, 2009.

The district court granted in part and denied in part the pending motions to dismiss and, on June 23, 2009, issued its scheduling order, which set a discovery deadline of November 9, 2009. Discovery then commenced among Jiggetts, the store, and the mall. Jiggetts was deposed by lawyers for Forever 21 and St. Charles Towne Center Mall on October 14, 2009. Long was not a party to the suit at that time and his attorney was not present at that deposition.

It is apparent from an examination of the district court record that Jiggetts' delay in finally joining Long as a defendant resulted from her counsel's uncertainty (whether justified or not, we do not know) and consequent inability to identify, Rodriguez and Eusantos and, concomitantly, his uncertainty as to whether Long should be sued as an agent of the owner of the mall.[2] Indeed, in due course, it emerged that

_____

[2] In the joint status report filed with the district court on November 10, 2009, pursuant to the Scheduling Order, Jiggetts averred:

> In view of recent disclosures as to the owner of the security company that employs mall security, Plaintiff will likely seek to Amend Complaint to add that company and Officer Long. Plaintiff is still unaware as to whether Officer Long was an off-duty police officer working part-time at the time of the subject incident.

(Continued)

13

Rodriguez and Eusantos were hired by a non-party security company, IPC, which operated the security function at the mall. Long, who, unlike the other two security officers involved in the case, was a sworn law enforcement officer, was paid by the owner of the mall but was supervised by, and reported up a command structure to, IPC personnel.

In any event, having unpacked all or most of the ownership and status/capacity issues alluded to above during discovery in the fall and winter of 2009, Jiggetts filed a motion for leave to file her Second Amended Complaint, joining Long as a defendant, on December 31, 2009 (well after the original deadline for doing so set forth in the June 23, 2009, scheduling order and, indeed, after what was to have been the deadline for the completion of discovery, November 5, 2009). By order filed on February 19, 2010, the district court granted the motion for leave to file a second amended complaint. The Second Amended Complaint was formally docketed on March 3, 2010; Long was named in three counts: one count each of false arrest and use of excessive force under 42 U.S.C. § 1983 and one count of assault and battery.

---

Status Report at 2, Nov. 10, 2009, ECF No. 66, No. 8:08-cv-01473-AW.

14

Long was served with process on or about March 31, 2010, and, after an extension of time granted by the district court, Long filed a Motion to Dismiss or, Alternatively, for Summary Judgment on June 15, 2010. As mentioned above, the motion was accompanied by material outside the pleadings. In her opposition to the motion, although she did not file (as she should have) a formal request and affidavit of counsel pursuant to Federal Rule of Civil Procedure 56(d) to seek necessary discovery in order to respond adequately to the motion, Jiggetts repeatedly invoked the principles underlying the rule.[3]

---

[3] Jiggetts argued as follows in her opposition to Long's motion seeking a determination of qualified immunity as a matter of law:

> Plaintiff submits that any representation from Officer Long and the Store Security officers is uncorroborated as Plaintiff has not enjoyed an opportunity to depose any of these individuals. Plaintiff will show credibility gaps nonetheless which should be resolved by a jury, rather than the court.

Pl.'s Opp'n to Def.'s Mot. Dismiss and/or Summ. J. at 4 n.2, July 12, 2010, ECF No. 98, No. 8:08-cv-01473-AW. See also id. at 9-10:

> Defendant Long seeks dispositive orders from this court, and particularly a summary judgment, before Plaintiff has been given any opportunity to depose this Defendant or to corroborate his significant representations as to what other witnesses told him and/or were themselves told. Indeed, Defendant Long claims that he relied upon the uncorroborated testimony of Mall Security guards Rodriguez and [Eusantos] to justify his stop and arrest of Plaintiff. See Long Affidavit at paragraphs 4, 7 and 9 at Defendant's Exhibit 1. Defendant Long further

(Continued)

15

B.

The district court treated Long's motion as one for summary judgment. The court first dismissed all claims against Long in his official capacity, citing Eleventh Amendment immunity. Jiggetts v. Forever 21, No. 08-1473-AW, 2010 WL 5148429, at *2 (D. Md. Dec. 13, 2010). The court next held that Long's Terry stop[4] of Jiggetts was proper because the information Long received from the security officers provided a reasonable articulable suspicion of criminal activity. Id. at *4. The court also dismissed the state law assault and battery count. Id. at *8.

As to both § 1983 counts, the court held that genuine issues of material fact existed that precluded summary judgment.

_____

> states that he subsequently relied upon the questionable and uncorroborated statement of the Forever 21 store manager. Id. at paragraph 10. No depositions have been taken of any of these witnesses, including Defendant Long. Further, as shown below, there are many factual inconsistencies which raise questions about credibility, an obvious basis for jury rather than judicial consideration. Hence, Plaintiff asserts that any ruling on summary judgment is premature.

Notably, at the conclusion of the hearing on Long's motion, the district court, intending to set a trial date, expressed surprise that discovery had not been completed. See J.A. 409-10 ("I thought discovery was over, but if it's not, then it's not.").

[4] See Terry v. Ohio, 392 U.S. 1 (1968).

16

_Jiggetts,_ 2010 WL 5148429, at *5-7. Regarding the arrest for theft, the court found a "genuine factual dispute as to whether Defendant Long had probable cause to arrest Jiggetts in light of the fact that Jiggetts allegedly showed the same officers who supplied Defendant [Long] with probable cause to arrest for theft that she had no stolen merchandise on her immediately after she exited the store." _Id._ at *6.

Further, the court held, given the differing accounts as to whether Jiggetts resisted arrest, there was a genuine dispute of material fact as to whether Long had probable cause to arrest Jiggetts for any crime. _Jiggetts_, 2010 WL 5148429, at *6-7. Finally, given the discrepancies in Long's and Jiggetts' accounts of the amount of force used, the court held there was a genuine dispute of material fact as to whether the amount of force was reasonable under the circumstances. _Id._ at *7.

The court therefore denied Long's motion, stating that "'[o]nce a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied . . . . [W]here there are [genuine] issues of material fact surrounding [the conduct of either an arrestee or an arresting officer] it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law.'" _Jiggetts_, 2010 WL 5148429, at *7 (quoting

17

Gainor v. Rogers, 973 F.2d 1379, 1385 (8th Cir. 1992)). Long noted a timely interlocutory appeal to this Court.

## III.

### A.

We have jurisdiction under Mitchell v. Forsyth, 472 U.S. 511 (1985); Johnson v. Jones, 515 U.S. 304 (1995); and Behrens v. Pelletier, 516 U.S. 299 (1996), to hear interlocutory appeals of denials of qualified immunity insofar as they turn on questions of law. See Jackson v. Long, 102 F.3d 722, 727 (4th Cir. 1996) ("The Johnson principle is limited to the circumstance where the dispute on appeal is whether a factual dispute was created. If, however, resolution of the factual dispute is immaterial to whether immunity should be afforded, the underlying legal question about whether immunity is to be afforded remains and may be appealed under Mitchell as a collateral order.").

### B.

As mentioned, we review de novo a district court's denial of a motion for summary judgment based on qualified immunity. Johnson v. Caudill, 475 F.3d 645, 650 (4th Cir. 2007). We "accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff." Waterman v. Batton, 393 F.3d

18

471, 473 (4th Cir. 2005). "To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." Id.

C.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

Following Harlow and Saucier v. Katz, 533 U.S. 194, 201 (2001), when a government official asserts a qualified immunity defense, we first must ask whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. The second step of the Saucier analysis requires us to determine whether the right at issue was "clearly established" at the time of the officer's

19

conduct – that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201. The Supreme Court in Pearson, 555 U.S. at 236, allowed lower courts the discretion to take the Saucier steps in whichever order makes sense in light of the particular circumstances of a case.

Here, Long argues that there was no genuine dispute of material fact regarding his encounter with Jiggetts, and that based on the record he should be granted qualified immunity on the § 1983 claims against him for false arrest and use of excessive force. Jiggetts responds that genuine disputes of material fact exist as to both counts, and that the district court was thus correct in denying Long's Motion to Dismiss or, Alternatively, for Summary Judgment.

Whether a dispute is genuine is for the district court – and not us – to decide. The issue, however, of whether a genuine dispute is material is a matter of law we may decide on interlocutory appeal. See Al Shimari v. CACI Int'l, Inc., 679 F.3d 205, 221 (4th Cir. 2012) (en banc) (stating that we have "jurisdiction over an appeal ... 'if it challenge[s] the materiality of factual issues,'" but "we lack jurisdiction if such an appeal 'challenges the district court's genuineness ruling — that genuine issues exist concerning material facts.'" (quoting Bazan ex rel. Bazan v. Hidalgo County, 246 F.3d 481,

490 (5th Cir. 2001))). See also Winfield v. Bass, 106 F.3d 525, 529-30 (4th Cir. 1997) (en banc) ("[T]o the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact — for example, that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged — we do not possess jurisdiction under § 1291 to consider the claim and, therefore, may not do so absent some independent jurisdictional base.").

The district court found "several facts are in dispute as to whether Officer Long had probable cause to arrest Plaintiff" for any crime, including theft and resisting arrest. Jiggetts, 2010 WL 5148429, at *5. The court noted a genuine dispute exists over whether Jiggetts swung at Long or attempted to kick one of the mall security officers. Id. at *6. The district court also found a genuine dispute over facts regarding whether the use of force was reasonable under the circumstances, given Jiggetts' and Long's differing accounts of the encounter. Id. at *7. These disputes are not for us to resolve.

The information that Long argues gave him probable cause for the arrest – the statements of the mall security officers to him – comes entirely from his untested affidavit testimony. It is unsupported by anything else in the record. Furthermore, Long's account in his affidavit of Jiggetts' behavior that led

21

to his use of force – particularly her swinging at him and kicking at a security officer – is also without additional support in the record. While two security officers were present and could potentially corroborate Long's account, the record contains no statements from them whatsoever. "[S]elf-serving statements in affidavits without factual support in the record carry no weight on summary judgment." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 925 (7th Cir. 2004) (emphasis in original).

We note that, despite its time pending on the district court's docket, as to Long this case is in a relatively early stage of litigation, and that Jiggetts has not had a reasonable opportunity to take discovery from any of the principal actors, Long, Rodriguez, and Eusantos, directly involved in her detention and arrest. Although we do not fault Long's counsel for "rushing for the exit," as it were, in seeking a preemptory ruling on qualified immunity, we also respect, as we must under Al Shimari and earlier precedent, the district court's determination (even on the truncated evidentiary record we summarized above) that genuine disputes exist. We hold that, in light of the spartan record before us, the disputes concern facts material to Jiggetts' § 1983 claims of false arrest and excessive use of force. The facts surrounding whether Long had probable cause for the arrest of Jiggetts, specifically, what

22

Long's informants, Rodriguez and Eusantos, told Long and whether the force Long used in effecting Jiggetts' arrest was reasonable under the circumstances, go to the heart of Jiggetts' lawsuit and are indeed material.

We therefore affirm the district court's holding that, at this stage of litigation, genuine disputes of material fact exist sufficient to preclude summary judgment on the issue of qualified immunity in favor of Long.[5]

IV.

For the reasons stated herein, the judgment of the district court is

AFFIRMED.

---

[5] We note that our opinion leaves open to Long the option of filing a further motion for summary judgment on the ground of qualified immunity at the conclusion of discovery. See Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 251 (D.C. Cir. 1987) ("A subsequent motion for summary judgment based on an expanded record is always permissible," particularly when "substantial discovery [takes] place after the denial of appellees' first motion for summary judgment"); Enlow v. Tishomingo County, Miss., 962 F.2d 501, 506 (5th Cir. 1992) (stating, "Courts have found that a subsequent summary judgment motion based on an expanded record is permissible," in case where qualified immunity was denied on first motion for summary judgment because the district court had found questions of material fact remained).